```
            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
            WESTERN DIVISION - LOS ANGELES
```

FOUR WORLD EVENT OPPORTUNITIES, ) CASE NO: 2:21-MC-1019-CAS-JPRx
LP, ET AL,                      )
                                )        CIVIL MISCELLANEOUS
              Petitioners,      )
                                )     Los Angeles, California
      vs.                       )
                                )   Thursday, November 18, 2021
HOULIHAN LOKEY, INC,            )
                                )     (9:59 a.m. to 11:25 a.m.)
              Respondent.       )
_____  )


            HEARING RE PETITIONERS' APPLICATION

        BEFORE THE HONORABLE JEAN P. ROSENBLUTH,
            UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:              SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Bea Martinez


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Petitioners:              DUANE L. LOFT, ESQ.
                              BRIANNA S. HILLS, ESQ.
                              JOHN KUCERA, ESQ.
                              Boise Schiller Flexner, LLP
                              55 Hudson Yards
                              New York, NY 10001

                              CHRISTINE MACKINTOSH, ESQ.
                              Grant & Eisenhoffer, P.A.
                              123 S. Justison St.
                              Wilmington, DE 19801

                              IRA A. SCHOCHET, ESQ.
                              Labaton Sucharow, LLP
                              140 Broadway
                              New York, NY 10005

For Respondent:               ALEXANDRA BARGOOT, ESQ.
                              Goodwin Procter, LLP
                              100 Northern Ave.
                              Boston, MA 02210

                              DOUGLAS H. FLAUM, ESQ.
                              Goodwin Procter, LLP
                              620 Eighth Avenue
                              New York, NY 10018

                              GALEN PHILLIPS, ESQ.
                              Goodwin Procter, LLP
                              601 S. Figueroa St.
                              41st Floor
                              Los Angeles, CA 90017

1    <u>**Los Angeles, California; Thursday, November 18, 2021; 9:59 a.m.**</u>

2                      <u>**(Remote appearances)**</u>

3                        **(Call to Order)**

4           **THE CLERK:**  Good morning, Judge.  Can you hear me?

5           **THE COURT:**  Yes.

6           **THE CLERK:**  This United States District Court is now

7    in session, the Honorable Jean P. Rosenbluth, United States

8    Magistrate Judge, presiding.

9           Calling Case Number 21-MC-1019-CAS(JPRx), *FourWorld*

10   *Event Opportunities, LP, et al. versus Houlihan Lokey, Inc.*

11          Counsel, please state your appearances for the record

12   starting with plaintiff.

13          **MR. LOFT:**  Good morning, Your Honor.  For Petitioners

14   this is Duane Loft from the Boies Schiller Flexner firm.  I'm

15   joined by several of my colleagues, beginning with John Kucera,

16   who's our California counsel.  I'm also joined by Brianna Hills

17   from Boies Schiller Flexner.

18          **THE COURT:**  All right.

19          **MR. LOFT:**  And we also have for petitioners Christine

20   Mackintosh from the Grant and Eisenhoffer firm, who's been

21   admitted pro hac in this case, as well as Ira Schochet from the

22   Labaton firm.

23          **THE COURT:**  All right.  Are various of you going to

24   be speaking, or are only you going to be speaking?

25          **MR. LOFT:**  I will be speaking.  Just --

4

1          **THE COURT:**  All right.

2          **MR. LOFT:**  Just me for the group.

3          **THE COURT:**  All right.  Thank you.

4          If the others don't mind muting their video, that --

5   so I don't have so many people staring at me, that would be

6   great.  Thank you.

7          And, then, for respondent?

8          **MR. FLAUM:**  Your Honor, this is Douglas Flaum from

9   the Goodwin law firm for respondent.  I'm here with two of my

10  colleagues:  my California colleague, Galen Phillips, and

11  Alexandra Bargoot, who is with me here in New York.  And I will

12  be speaking on behalf of respondent.

13         **THE COURT:**  All right.  Thank you.

14         I am going to see if I can figure out how to turn my

15  speakers up, because you're all a little faint.  So, give me

16  one second.

17         All right.  Can somebody say something?

18         **MR. FLAUM:**  Hello, Your Honor.

19         **THE COURT:**  That's much better.  Thank you.

20         All right.  So, I did receive the directions order

21  yesterday, and I did read it.  I think I'd like to start simply

22  by hearing from each side how you think, if at all, that

23  affects the briefing and which portion of the order in specific

24  you want me to refer to.

25         So, I think maybe petitioner should go first?

1          **MR. LOFT:**  Sure, Your Honor.  I'm happy to.  Again,

2     Duane Loft from Boies Schiller Flexner.

3          I think it is important to begin with an update on

4     the Cayman proceedings and the directions order.  As you saw

5     from the papers, the principal objections from the respondent

6     had to do with the status of the proceedings.  They said,

7     effectively, our 1782 application was too early in the process

8     relative to the progress of the Cayman proceedings.  They said

9     that at that time there hadn't been this directions order, so

10    we didn't know the scope of discovery that would be available

11    from the company, the foreign defendant in the foreign

12    appraisal case.  They said:  We don't know what remaining

13    documents will be needed from Houlihan, the respondent in this

14    case.  And now we have answers to those questions.

15         The Court in the Cayman Islands has now issued this

16    directions order.  This is the document that you have in front

17    of you; it was sent to your chambers yesterday.  And what it

18    tells us is something about the scope of discovery that will,

19    in fact, be available from the company that's the defendant in

20    that appraisal case.

21         Now, in terms of Houlihan -- and I'm sure counsel for

22    respondent can correct me if I'm directing you to the wrong

23    place, but I believe that the category of documents relating to

24    Houlihan is at Appendix 4, Category A.

25              **THE COURT:**  That's what I thought as well, but maybe

1    that's not right, and if so, I'm sure he'll let us know.

2            **MR. FLAUM:**  I promise to.

3            **MR. LOFT:**  There's an -- I mean, for completeness on

4    my part, there is a category F, as in Frank, that does

5    reference projections sent to the financial advisor.  So, he

6    may mention that one.  But I think the principal category is

7    this category A, and it requires production by the company of

8    documents produced by, provided to, or received from Houlihan

9    Lokey, which is the relevant respondent in this case, or at

10   least the foreign subsidiary of the respondent.  Those

11   documents, pursuant to that particular category, as I

12   understand it, have now been produced.  The company's deadline

13   to produce those documents was back on September 6th.

14           So, in preparation for today's hearing, we reviewed

15   those documents.  And what we found was that there --

16           **THE COURT:**  Wait, can I -- can I interrupt you for a

17   second?  You said the -- oh, I'm sorry.  Go ahead.  Sorry.

18           **MR. LOFT:**  That's okay.  That's all right.

19           The company in the Cayman Islands proceeding produced

20   a category of documents.  Now, it's our understanding,

21   principally based on the declaration that Mr. Flaum submitted

22   in the case, that the category of documents in part was

23   retrieved from Houlihan, from the respondent in this case, and

24   then produced in the Cayman Islands.  So, we wanted to be sure

25   about exactly what was produced pursuant to that category.  And

```
1    when we went into the production, we found only 126 documents
2    where Houlihan was identified as a custodian; which we infer to
3    be the sum total of the documents that Houlihan, the respondent
4    in this case, would have provided to the company to be produced
5    in the Cayman Islands pursuant to this directions order.
6              Now, in his declaration to this Court, that Mr. Flaum
7    submitted in their reply papers, he said that his client turned
8    over at least 750 documents to the company as part of this
9    particular production exercise under the directions order in
10   the Cayman Islands.  Again, all we see in the company's
11   production is the 126 documents.
12             THE COURT:  Well, they're not necessarily
13   inconsistent, because the company is the one that, as I
14   understand it, uploaded them, so is it not the case that
15   Houlihan provided 750 to the company, but the company only
16   uploaded 126?
17             MR. LOFT:  And that's exactly the point, Your Honor.
18   That's exactly why we're here and we're still seeking the 1782
19   discovery.  There are really two -- two issues.
20             First, this limited production that came from the
21   company pursuant to the obligations of the company, not
22   Houlihan, in the Cayman Island proceedings, means that it's
23   especially necessary that we get a full and complete production
24   from Houlihan itself.  We don't know what happened to the rest
25   of the documents.  Mr. Flaum said that he gave 750 documents to
```

1   the company; the company produced 126.  We don't know what

2   happened to the rest.

3          The Cayman process is very different from the process

4   that you and I deal with every day under our federal rules.

5   And Houlihan is not a party in the Cayman case.  It has no

6   discovery obligations there.  It made a voluntary production,

7   as we understand it, to the company, and then the company,

8   pursuant to its obligations, not Houlihan's, produced that

9   discovery in the Cayman Island process.  And there's a lot of

10  case law under the 1782 context that says you can get 1782

11  exactly in these circumstances, even if it overlaps with the

12  discovery in the foreign proceeding.  And that's because the

13  rules are very different in other countries.

14         So, the first issue, the first reason why we need

15  1782 is for this set of documents that Houlihan gave to the

16  company.  There shouldn't be any burden in producing those

17  documents.  If there are privilege issues, they can give us a

18  privilege log.

19         **THE COURT:**  So, Mr. Loft, I just want to -- you can

20  certainly add to what you've said so far, but I want -- confine

21  your statements right now just as to how the directions order

22  impacts the briefing, because I don't want the argument based

23  on the briefing yet.  So --

24         **MR. LOFT:**  Understood.  Now -- I want to be

25  responsive to the Court's question.  I don't think that there

1    is anything left of the respondent's arguments that we saw in

2    the briefing.  I mean, their arguments were that we filed for

3    1782 too early; we needed to see the directions order, we

4    needed to know the scope of discovery, and then if petitioners

5    have remaining documents that they want, they should come back

6    to the Court at that time.  That was essentially their argument

7    in the briefing.  I think events have now overtaken those

8    issues.

9             **THE COURT:**  All right.  Let me hear from Mr. Flaum

10   just as to the directions order and its impact on the briefing.

11            **MR. FLAUM:**  So, Your Honor, thank you.  And, not

12   surprisingly, I disagree with Mr. Loft, and I actually think

13   the direction order has a large impact on the briefing and the

14   case, and that's why I was the one who brought it to the

15   Court's attention.

16            I think on the document issue, it -- the important

17   things to look at is Section 8 of the direction order,

18   particularly, Section 8.1, which talks about what documents the

19   company is supposed to turn over.  And the way it works in the

20   Caymans, Your Honor, is the company collects from its agents,

21   which includes Houlihan here, and then it produces them.  And,

22   so, if you look at 8.1, it talks about that it has to hand over

23   all the documentation, including it got from Houlihan, for a

24   five-year period, ending on the valuation date, and it's all

25   electronic, hard-copy, or other documents.

1        And Section 8.1 refers to Appendix 4, which Mr. Loft

2   mentioned, at A, which talks about and mentions specifically

3   Houlihan.  But also, importantly, if you look at the next page

4   of Exhibit -- of Appendix 4, there's other categories,

5   including category B, which is communications with the special

6   committee.  There's item E, which is communications in respect

7   of the special committee's engagement of the financial advisor,

8   which is Houlihan.  It includes section F, which includes

9   communications and documents and other materials, discussion

10  projections which were sent to the financial advisor, which,

11  again, is Houlihan.  If you look at item I, it talks about any

12  communications and documents relating to communications with

13  the buyer group.

14        All of those categories are categories of documents

15  that Houlihan, at the request of the company, searched for and

16  provided to the company.  Mr. Loft made the point that he found

17  126 documents that were tagged as being from Houlihan.  We

18  certainly provided slightly in excess of 750 to the company

19  and, particularly, to the company's counsel, for production.

20  My understanding, based on a conversation I had yesterday, is

21  that all those documents have been provided, but they were not

22  duplicated.

23        So, to the extent they got -- for example, if you

24  look at a communication between Houlihan and the special

25  committee, to the extent they -- that -- by definition there

11

1   are two parties:  the special committee, which is part of the

2   company, and Houlihan.  So, if they got that document from the

3   special committee, and get a second identical copy from

4   Houlihan, they only put one in the data room.  And that's what

5   explains the difference in number.  We did a very fulsome

6   search and production, which is documents that they have

7   already.

8         The other area that I think the directions order has

9   a significant impact on the briefing and the argument today is,

10   if you look at items 41 and 42 on page 11 dealing with factual

11   affidavits, it lays out there the Cayman court's process by

12   which it would take factual evidence, and, particularly,

13   factual evidence from non-parties, and that would be by

14   affidavit.  And what the directions order provides is that if

15   someone puts in an affidavit -- and I will represent to this

16   Court that Dan O'Donnell, who is the principal Houlihan person

17   working, is going to be submitting an affidavit -- that the way

18   it works is an affidavit is submitted.  Once that affidavit is

19   submitted, then there is additional discovery obligations that

20   occur.  Everything relied on in that affidavit and everything

21   that underlies the opinion or statements in that affidavit has

22   to be produced.  So -- and that all happens after -- let me

23   step back.  And, then, after that happens, then there's no

24   deposition in the Cayman proceeding.  What there is, is a right

25   of cross examination.

1          So, the court in the Cayman says this:  If you want

2   to put in evidence, put in the affidavit, and then you have to

3   produce any additional documentation that relates to that, and

4   then you get to have that evidence tested at cross examination.

5   Nothing about a deposition being -- being part of it.  And --

6          **THE COURT:**  Well, I did -- let me interrupt you,

7   because I actually had a post-it noted at paragraph 42, and I

8   had it underlined.  So, I just want to make sure I understand,

9   because I think I'm reading it the same way you are.  But, so,

10  somebody submits a factual affidavit, and you've said that

11  somebody from Houlihan will, and then that person has to attend

12  physically the proceedings --

13          **MR. FLAUM:**  Correct.

14          **THE COURT:**  -- and be subject to cross examination.

15  But my question was, you know, in the United States, we limit

16  cross examination to the subject matter of what the person

17  testified to on direct; how am I to know whether petitioners --

18  to the extent your representative did not touch on something in

19  their affidavit that petitioners want to ask them about, would

20  they be allowed to do so?

21          **MR. FLAUM:**  The -- I'll be completely -- I don't know

22  the answer to Your Honor's question.  You know, my

23  understanding is that they are subject to, you know, full --

24  you know, full cross examination by -- in front of the -- you

25  know, the judge in the Caymans.  What the exact scope of that

1    cross examination is I don't know.  We can find out (indisc.),

2    but I don't know sitting here, Your Honor.

3              **THE COURT:**  All right.  Thank you.

4              **MR. FLAUM:**  So, I think those are the two areas that

5    I think the -- and the way it works, and this is, I think -- is

6    that the affidavit and the way the directions order goes, that

7    all happened after.  Right now there are documents that are

8    being posted to a data room, including the Houlihan documents

9    and others.  Now, the Court just came out with the directions

10   order last week, and so there may be additional documents.  And

11   those documents will be posted -- the way it works is 175 days

12   from July 26th, which when I looked at the calendar, was sort

13   of the end of January.  It's only -- so, there may be

14   additional documents that -- or different categories that we

15   may be asked to search for, but I have no idea.  But it's only

16   after that, that there would then be these affidavits, and then

17   any additional documentation, and then the in-person cross

18   examination all follows after that.  And the document

19   productions haven't even completed yet --

20             **THE COURT:**  All right.

21             **MR. FLAUM:**  -- as I understand the process.

22             **THE COURT:**  All right.  So, Mr. Loft, you can respond

23   to that, but I also had a couple of questions for you that I

24   was hoping you could address.  One is, I have no idea where

25   your February, 2019, date is coming from, and I did search --

14

1    you provided cites to the proxy statement, but I looked at the

2    proxy statement, and all the dates that are being discussed at

3    the pages you cite to the proxy datement [sic] -- statement --

4    are in the middle of 2020.  So, I just -- you have not provided

5    me with any reason to think it's appropriate, to the extent I

6    do let you serve a subpoena, to go back to February, 2019, or

7    anywhere near that.

8            The second question I wanted to ask you -- and let me

9    grab something.

10       **(Pause)**

11       **THE COURT:**  On page 30 of your application you say

12   that there are two issues on the appraisal proceeding.  And I

13   know Mr. Flaum pointed this out as well.  I certainly

14   understand why the valuation analyses provided by Houlihan to

15   the special committee are at issue, but why on earth is the

16   process undertaken by the special committee to approve the

17   merger at issue here when the only issue, as I understand, in

18   the Cayman Islands, is the valuation of the stock shares, or

19   whatever you call them, as of September 6th.  So, I don't

20   understand at all why that first category, why I should let you

21   get any documents related to that first category and why I

22   should go back to February, 2019.

23       **MR. LOFT:**  Thank you, Your Honor.  I'll respond to

24   those two questions; then I'll touch on the points that

25   Mr. Flaum raised, and then I do want to get to my third point,

15

1  which has to do with the categories of our subpoena that do not

2  overlap with --

3        **THE COURT:**  All right.

4        **MR. LOFT:**  -- what happened in the Caymans.

5        So, with respect to the date range issue, Your

6  Honor's comments are totally fair.  And what we wanted to make

7  sure was that we were capturing documents that preceded, at

8  least for some short period, the engagement of Houlihan.

9  Because as we understand it from the proxy, there was a

10 selection among several financial advisors, and there were

11 meetings and pitches with the financial advisors, including

12 Houlihan, that led up to the engagement.  So, we would ask for

13 some modest period preceding the April 27th, 2020, date that

14 Houlihan was retained.  But your comments are totally fair; it

15 does not need to go back all the way to February 1st, 2019.  I

16 think the beginning of April of 2020 would probably be adequate

17 for our purposes.

18        **THE COURT:**  All right.

19        **MR. LOFT:**  Now, as to process, it may take me a

20 little while to find the exact paragraphs of the declaration

21 submitted by the Cayman lawyers in support of our application.

22 But my understanding is that the analysis in the Cayman Islands

23 proceeding on appraisal, I think similar to our appraisal

24 cases, is it's an analysis not only of whether the price is

25 fair, but also whether the process that led to that price was a

16

1     fair process.  And an unfair process, if it's established, can

2     impact the assessment of whether the price that was the result

3     of that process, in fact, was a fair price.

4            Now, a lot of our requests go to valuation.  Those go

5     directly to price.  A lot of our requests -- and this is where

6     I'll get to the over -- the non-overlapping requests.  A lot of

7     our requests go to discussions that Houlihan was having

8     regarding due diligence with the buyer group; discussions that

9     may not have ever touched the company, that the company may not

10    be producing in the Cayman Islands, but that are highly

11    relevant, not only to process, but especially to price.

12    Because the buyer's group view of price, the diligence that

13    they were seeing, are very much relevant to the inquiry that

14    the Cayman court will conduct as to whether the price was a

15    fair price; the buyer's own valuation, the buyer's assessment

16    of the diligence that it was obtaining, and based on the proxy,

17    we understand that the Houlihan firm ran that diligence process

18    with the buyers.

19           Now, if I could just go back to the points that

20    Mr. Flaum made.  He pointed to 8.1, which is the obligation of

21    the company in the Cayman Islands to provide documents in their

22    possession, custody, or control.  This is the first we're

23    hearing that Houlihan is within that category.  We weren't

24    aware that Houlihan is in the possession, custody, or control

25    of the company.  We're not sure of that.  Even if it is, we

1   have no visibility into whatever the company and Houlihan

2   worked out would be the parameters of Houlihan's collection.

3   This wasn't party discovery.  This was whatever the company

4   worked out with Houlihan, a third party, that then the company

5   would ultimately produce into the Cayman Islands.  That's not

6   third party discovery; it's not the discovery that we would ask

7   for under 1782; that's not the discovery that we would conduct

8   under Rule 45 if we're permitted to take that discovery.  We

9   would be seeking discovery directly from Houlihan, and

10  understanding exactly the reasonable search that they're

11  conducting under our federal rules to obtain the documents.

12          The next issue that Mr. Flaum raised has to do with

13  the witness affidavit.  Now, as we understand this process, the

14  witness isn't going to provide an affidavit until very close to

15  trial, possibly the eve of trial.  And if we have to wait until

16  then to obtain whatever discovery comes out of that process and

17  then come back to this Court for additional discovery to be

18  able to test the assertions that are being put forward by this

19  witness, to be able to understand the full scope of evidence,

20  not just what this witness is relying on, we're going to be too

21  late, as I understand it.  We're not going to have enough time.

22          **THE COURT:**  But isn't that -- I mean, that's the way

23  the Cayman Islands has set it up, and the argument you're

24  making, it seems to me, would be contrary to the -- or would

25  work against you with a third *Intel* factor, which is whether

18

```
1    the request is an attempt to circumvent foreign proof-gathering
2    restrictions or other policies of a foreign country.  Because
3    if that's the way they set it up, and you are going to have a
4    chance to cross examine their deponent or affiant, then I don't
5    see -- your arguments, it seems to me, are contrary to that
6    third factor.
7             MR. LOFT:  We don't believe it would be a
8    circumvention to be able to take third-party discovery from
9    Houlihan, which is not prohibited by the directions order.
10            THE COURT:  I'm not -- I'm not talking about the
11   third-party discovery as a whole.  I'm talking specifically
12   about a deposition.
13            MR. LOFT:  Okay.  You're talking about the
14   deposition.
15            THE COURT:  Right.
16            MR. LOFT:  We don't understand a deposition to be
17   prohibited by the directions order to be prohibited by the
18   Cayman process.
19            THE COURT:  No, I don't --
20            MR. LOFT:  The witness --
21            THE COURT:  I don't think it's prohibited either.
22   What I'm saying is that there are these four Intel factors that
23   are discretionary, and one of them is whether the request is an
24   attempt to circumvent foreign proof-gathering restrictions.
25   I'm not saying -- and it doesn't say, you know, prohibitions;
```

1   it says restrictions.  I'm not saying that it's absolutely

2   prohibited for you to take a deposition, but wouldn't the third

3   *Intel* factor work against you?  Because they have set up a

4   system for essentially taking someone's deposition.  And, so,

5   wouldn't your separately trying to take a deposition much

6   earlier -- and they seem to think that it's plenty of time for

7   you to do it at the end -- wouldn't you, then, be trying to

8   circumvent their proof-gathering policies?

9        **MR. LOFT:**  Well, first of all, I don't understand

10  paragraph 42 to allow for a deposition.  I think this is live

11  cross examination at the trial.  Mr. Flaum can correct me, but

12  I think this is a witness who would testify live at the trial,

13  and there is no provision, one way or the other --

14       **THE COURT:**  He submits an affidavit first, which --

15  you know, you're right, it's not exactly the same thing as a

16  deposition, but what provision of the directions order would

17  you, then, say -- I know there's a section for the dissenting

18  folks to submit evidence.  Under which paragraph would you be

19  able to submit this deposition testimony, and, if you did that,

20  would you then -- what -- would they accept it if that

21  person -- because they're saying that cross examination has to

22  take place at a proceeding, not at a deposition, it seems to

23  me, for this factual development.

24       **MR. LOFT:**  That's right.  So, there are two ways we

25  would use the deposition.  If the deposition testimony is

20

1   admissible at the time we are due to submit our final evidence,

2   which I believe takes place in April of 2022, then we would

3   submit the deposition transcript subject to whatever hearsay

4   restrictions there are on submitting that.  And our supporting

5   affidavits from the Cayman lawyers make clear that the judge

6   may receive, and has received in other cases, deposition

7   transcripts from 1782 proceedings under their hearsay rules.

8          The second phase --

9        **THE COURT:**  I'm sorry.  Can I interrupt you one more

10  time?  I -- you keep saying the Cayman lawyers.  I did read the

11  expert declaration of Judge Mangatal.  Was -- but I don't

12  recall something from a -- just, you know, a Cayman lawyer who

13  practices there.

14       **MR. LOFT:**  This was from the declaration of Marc

15  Kish.  Marc Kish is counsel to the parties in the Cayman

16  proceeding to my clients.

17       **THE COURT:**  And I'm sorry.  Can you point me to

18  where -- where that is, what exhibit it is or --

19       **MR. LOFT:**  It was a Marc Kish declaration submitted

20  in the opening application at ECF 1-2, and, then, there was a

21  declaration from Marc Kish submitted in connection with our

22  reply briefing at ECF 31-1.

23       **THE COURT:**  All right.  Thank you.

24       **MR. LOFT:**  And at paragraph 14 of 31-1 from the

25  docket, Mr. Kish talks about the use of deposition transcripts

1    in Cayman Island proceedings; because we received criticism

2    from Mr. Flaum in his opposition that we have not cited a case

3    where a Cayman court in an appraisal proceeding had actually

4    admitted deposition transcripts from a 1782.  As we --

5              **THE COURT:**  I'm sorry.  I did read that, and I

6    actually have that part underlined, so I just forgot.

7              **MR. LOFT:**  But, so, that was a case where the Cayman

8    court considered transcripts as admitted for their truth under

9    the hearsay rules subject -- that were applicable in the Cayman

10   proceeding.

11             The second way in which we would intend to use this

12   is, if the testimony from the deponent in these 1782 cases is

13   the actual testimony from whichever witness they intend to

14   provide as their witness in the Cayman trial under this

15   directions order at paragraph 42, then we would cross examine

16   the witness with the prior witness's -- with the witness's

17   prior statements, just like you would do in a U.S. proceeding.

18             And under the circumvention factor, my experience has

19   been -- and the Court may have a different experience, but my

20   experience has been that that factor is implicated when there

21   is a restriction on the proof gathering in the foreign

22   proceeding, where the foreign proceeding and their rules say

23   you cannot go and get this evidence; and under 1782, a party is

24   trying to go around that to circumvent it knowing that there is

25   an absolute prohibition on the ability to gather that proof.

1        **THE COURT:**  Well, it says to circumvent foreign

2  proof-gathering restrictions, which is what you are saying, or

3  other policies.  And, to me, another policy is they've laid out

4  this procedure, and you're trying to do something different.

5        **MR. LOFT:**  Well, I think, Your Honor, that would

6  prove too much.  Because every time you're in a 1782 you would

7  have a foreign jurisdiction that allows for some discovery and

8  not others.  And if it's narrower than the U.S. rules, you'd

9  face this argument every time; that you're seeking discovery

10  broader than what the local jurisdiction provides, and

11  therefore you're circumventing the jurisdiction's rules.  But

12  that hasn't been the law under 1782 as it's developed.

13        If the local rules are silent on the issue, which I

14  think they are here, and I think the directions order is silent

15  on whether we would have the right to take a third-party

16  deposition, then I don't think there is a circumvention under

17  the case law, as I understand it, on the circumvention factor.

18        **THE COURT:**  All right.  I interrupted you so many

19  times.  Did you have anything else you wanted to say?

20        **MR. LOFT:**  The last thing I wanted to say, Your

21  Honor, is I just wanted to direct the Court to a number of our

22  requests that we don't believe would be covered by the

23  discovery that may take place in the Cayman --

24        **THE COURT:**  Well, I did -- sort of at the end, I

25  wanted to go over the subpoena, and specifically sort of one by

1   one, because I do think you're going to have to submit some

2   kind of revised proposed subpoena, if only because of the date,

3   and I think some of the other categories.  So, why don't we

4   save that for the end and lay that out.

5          All right.  Mr. Flaum?

6     **(Pause)**

7          **THE COURT:**  I think you're muted.

8          **MR. FLAUM:**  My apologies.

9          **THE COURT:**  No problem.

10         **MR. FLAUM:**  I'll try to be relatively brief, Your

11  Honor, and address Mr. Loft's points.

12         The point Your Honor was making that, you know, this

13  is a circumvention under item three of the discretionary Intel

14  factors is exactly correct and is exactly the point that Judge

15  Birotte -- if that's -- if I'm pronouncing it correctly --

16         **THE COURT:**  Birotte.

17         **MR. FLAUM:**  Birotte -- and my apologies to him --

18  made in the *Quadre* case, which is remarkably similar to this

19  one, in the sense that it dealt with a Caymans appraisal

20  proceeding.  In fact, it even dealt with Houlihan and a

21  subpoena on Houlihan, where the judge denied and did not

22  allow -- he allowed some much more circumscribed document

23  discovery that had been sought, but did not allow the

24  deposition.  And one of the major reasons, which he states in

25  the third page of his decision, is that when you look at the

1   directions order, that lays out what the Cayman court wants,

2   how it wants this to go.  There is no mention of a deposition,

3   and he found that to be relative, if not dispositive, on the

4   issue in the third *Intel* factor of not allowing the deposition

5   to go forward.  And we believe that's, you know, correct and

6   correct here.  The Court there has laid out how it wants to

7   handle evidence, and the direct testimony comes in by

8   affidavit, and the cross is done live in front of him or her --

9   I'm not sure even who the judge is in that case -- and that's

10  the way it's done.  And this would be a clear circumvention of

11  that.

12         I also want to point out that the Kish affidavit at

13  14 talks about that he's informed by some other lawyer that in

14  one case that they could find, the *Nord Anglica* [sic] case,

15  that the Court -- he believed that the Court considered

16  transcripts of depositions taken.  Now, first of all, those

17  depositions actually did not include the depositions of a

18  financial advisor, because that was the exact deposition that

19  Judge Birotte did not allow.  So, we're not talking about

20  (indisc.).  But, more importantly, I've read, and read

21  carefully, the very lengthy decision by the Cayman judge in the

22  *Nord Anglica* [sic] matter, where the judge goes through in --

23  mainly all the evidence in that, the evidence put forth on --

24  by each witness, judging the credibility of witnesses, judging

25  everything.  There is not a single mention of any deposition in

1   that decision.

2            So, I don't know if the lawyer that Mr. Kish talked

3   to that forms his belief that they were put in evidence is

4   right or wrong; I'm assuming he's telling the truth and he

5   really believes that, but I will tell you that if you read that

6   decision, and I believe it's in the materials that we

7   submitted, there is no mention of that.  So --

8            **THE COURT:**  I did read it.

9            **MR. FLAUM:**  -- I think when you look at --

10           **THE COURT:**  I did read it.  I can't say I didn't skim

11  some parts, but I did read it.

12           **MR. FLAUM:**  So, I -- I read it carefully for this

13  purpose.  And, you know, so, I think -- I think, again, Judge

14  Birotte's decision is correct, and *Intel* factor three and the

15  other (indisc.), you know, would preclude a deposition, which I

16  think, you know, should not occur here.

17           As far as, you know, the breadths of the requests,

18  you know, I think if where Your Honor is -- is going, I want to

19  read -- you know, two is that there should be a far more

20  limited request.  Our view is that almost everything, if not

21  everything, is going to turn out to be stuff that we've already

22  provided, but, you know, we're certainly -- you know, we

23  certainly understand that, you know, that 1782 can permit

24  document discovery, and, you know, probably if actually a

25  really tailored request came in, I would think Mr. Loft and I

1    could meet and confer and figure that out, hopefully, or, you

2    know, we, obviously, have ability to come back to Your Honor.

3           But I think the deposition is a different animal than

4    the documents.  I think documents -- it may be that his, you

5    know, desire to get more relates to the fact that, you know,

6    the way it was done in the Caymans is, they didn't say, you

7    know, that -- it is 750 documents, including, I believe, about

8    500 emails, and it would have included -- you know, Mr. Loft

9    discussed, you know, discussions with the buyer group and

10   diligence of the buyer group.  All communications with the

11   buyer group, that was in the stuff -- in the materials that was

12   asked of us and that we turned over to counsel for the company.

13   That's one of the items in Appendix 4; I believe it is item --

14   communicate with the buyer group is item I, which I identified

15   earlier.  That was one of the requests that was made to

16   Houlihan, and we voluntarily agreed to hand over -- you know,

17   to do a search and to hand over those materials, which we did.

18   And, you know, I think -- I don't know if the 127 that are

19   marked as Houlihan, how many of those fit that category or not.

20   I don't really -- I haven't gone through what we've produced in

21   the Cayman with our name on it.  I do know what we gave them,

22   which included that material.

23           **THE COURT:**  All right.  I mean, I do think that, at

24   least to some degree, FourWorld is entitled to, just as someone

25   would be in conducting discovery in a regular civil case in the

1    United States, to test two productions against each other and,

2    you know, to ask you for documents to ensure that, you know,

3    what they are getting from the company is -- is exhausted, and

4    vice versa.  So, but I appreciate the burden argument.

5         That leads me to something else I wanted -- sort of

6    two other issues I wanted to discuss:  the cost-shifting issue.

7    Certainly there has been no showing whatsoever that the cost to

8    Houlihan is significant, and the law is clear that the Court

9    has to take into account the sort of status and the means of

10   the company that's asking for the cost shifting, the -- the

11   respondent.  You know, there is a case which I could find, but

12   I think it's *UPS*.  The Court says that a $250,000 burden to UPS

13   is not significant because UPS has so many resources, whereas,

14   you know, there's other case law where a $9,000 cost to an

15   individual is significant because they were nearly indigent.

16        So, I don't know at this point what Houlihan's means

17   are and what's going to be, you know, (a) a significant cost to

18   them, and (b) what's going to be burdensome.  Because I just

19   don't know enough about Houlihan as to, you know, what -- what

20   their means are.  You know, clearly, they have a fine attorney

21   representing them, and, you know, have some resources.  So, as

22   to the cost shifting, I certainly would -- to the extent

23   Houlihan asked for the costs to be shifted, I would certainly

24   consider any such application, but they would have to make a

25   showing that the costs were significant to them given their

1    resources and means.

2          I also wanted to ask you, Mr. Flaum, about the

3    protective order argument you made.  It seemed to me that you

4    were speaking about protective order in terms of limiting the

5    amount of information that petitioners were permitted to get

6    from you, but also, you know, certainly I don't know, but maybe

7    you -- you meant a protective order also in the sense of

8    something that would keep confidential certain information and

9    state that it could only be used for purposes of the Cayman

10   proceeding.  So, I guess my question to you is, were -- you

11   were talking about that sort of protective order as well?

12         **MR. FLAUM:**  Let me address that.  We can go quickly

13   in a second to the fee shifting, but (indisc.) what we're

14   really looking for, and it depends on what it is Your Honor

15   orders us to produce, but the concern is one of potential

16   confidentiality --

17         **THE COURT:**  Okay.

18         **MR. FLAUM:**  -- not a particular -- and -- and the

19   issue -- and this is -- this is something which I'll preview

20   for Your Honor, and it's an issue that's come up in other cases

21   I've worked on, and maybe ones Mr. Loft has, as well, involving

22   Cayman.  If we were in your court and we were asked for a

23   protective order, we would then ask for the ability to file

24   certain documents that were highly sensitive under seal.  And

25   Your Honor would consider that and -- and in the right

1  circumstances, where it really was proprietary, would grant it,

2  I presume.  That -- the same protections don't automatically

3  exist in the Caymans.  And, so, there are very thorny issues

4  that come up if certain documents are really proprietary

5  information.  And what they've asked for in a lot of these

6  things is, is the document shared amongst parties, but anything

7  relating to, which could have, you know, sort of trade secret,

8  how -- how Houlihan does certain analyses, and other things

9  which are very proprietary.  And --

10          **THE COURT:**  But isn't there something in the

11  directions order about keeping things confidential and not --

12          **MR. FLAUM:**  Well, we would just need to make sure

13  that any order, you know, that it was fully protected by that.

14  I didn't really study the directions order, that provision, but

15  that's what we're -- it would be something that would, you

16  know, provide for protection of confidential information,

17  including making sure that in directing if we had to produce

18  it, that they took all necessary steps to ensure that it

19  remained protected, not only here, for purposes of discovery,

20  but in the Caymans, which has -- which doesn't have a, you

21  know, sort of robust filing under seal process, as I understand

22  it.  And so --

23          **THE COURT:**  Well, there --

24          **MR. FLAUM:**  -- those are the issues that (indisc.).

25          **THE COURT:**  There is something in the protect -- in

1  the direct -- directions order about keeping stuff

2  confidential.  I understand your concerns.  I'm not going to

3  tell the Cayman court what it can and can't make public, but

4  I'm certainly willing to -- I mean, I think that would be

5  something that the parties should meet and confer concerning

6  and submit some sort of proposed protective order.  You know, I

7  have one on my web page.  Obviously, it's geared toward U.S.

8  litigation.  But I'm certainly willing to consider something,

9  but in negotiating that I would want the parties to keep in

10  mind that, other than what's in the directions order, I would

11  be hesitant to, again, tell the Cayman court what they can and

12  can't do.

13        MR. FLAUM:  I agree, Your Honor, and I wouldn't ask

14  you to tell them.  That's just -- it's a complication that

15  comes up in these situations.  But, you know, we've -- I've

16  negotiated solutions to it with other counsel, and I'm sure

17  Mr. Loft and I can at least give that a robust try.

18        THE COURT:  All right.

19        MR. FLAUM:  Just quickly on the fee shifting, you

20  know, I will say that, you know, we'll have to consider it.  A

21  lot of it depends on the scope and the burden.  You know,

22  Houlihan is certainly not in forma pauperis.  It's a

23  significant investment bank.  You know, it's -- we've got

24  investment banks against big hedge funds; we have lots of, I

25  think, fortunately for me and Mr. Loft, well-heeled clients on

1    both sides here.  And I recognize that, and I recognize the

2    law, but -- and we'll have to see what the burden is, but

3    we'll -- we're -- if we get a -- you know, keep that request,

4    we'll make the proper showing.

5            **THE COURT:**  Yeah, that's -- that's certainly up to

6    you.  I am just, you know, going to deny that request as it's

7    presented in the current briefing without prejudice, and then

8    you can certainly -- it's up to you if you want to request it

9    with the proper showing.

10            All right.  So, did anybody else have anything they

11   wanted to say before we go through the subpoena as it currently

12   exists to talk about each of the categories?

13           **MR. LOFT:**  The only issue I would address is the

14   deposition issue, but we can -- we can do that after.  I

15   just -- if the Court is inclined to, you know, accept some of

16   the arguments you're hearing from Mr. Flaum, I'd like to be

17   able to respond on the deposition.

18           **THE COURT:**  Well, why don't you do that now.  I think

19   I'm going to have to think a little bit more after this hearing

20   about the deposition issue and really go through the factors,

21   the discretionary factors, in my mind, and do a little research

22   on my own about the deposition issue.  I'll try to get

23   something out quickly, but -- so, you're welcome to respond now

24   to his arguments.

25           **MR. LOFT:**  Thank you.  I'll just leave the Court with

1    a couple of points on the deposition issue.  First, with

2    respect to the *Quadre* case, the Judge Birotte decision, that

3    was an appeal from Judge Standish.  He denied the deposition on

4    two grounds.  One, he said that the petitioners had failed to

5    apprise the Court of their interest in deposing respondent.

6            **THE COURT:**  Right.

7            **MR. LOFT:**  That's not an issue here.  We've told --

8    our Cayman counsel has told the Cayman court from the outset

9    about the intent to take discovery under 1782, and there is

10   even a reference in this directions order to the 1782, to the

11   opportunity to take 1782 discovery.  So, we just don't think

12   that that's an issue at all here.  But it wasn't --

13           **THE COURT:**  I did read the -- the *Quadre* case, and I

14   did think it was -- was different.

15           **MR. LOFT:**  Yeah, and I'm sure Your Honor recognized

16   the second difference, which was that, in that case, at that

17   time, the petitioners had not identified for Judge Birotte any

18   case where the deposition had been admitted in the Cayman

19   proceeding.  And, you know, we respectfully disagree with

20   Mr. Flaum and his characterization of our evidence, but I --

21   our evidence from Mr. Kish, unchallenged by any contrary

22   evidence from Cayman counsel on their side, is that the Court

23   in *Nord Anglia* admitted deposition transcripts.  So -- so,

24   we've addressed that issue, as well, and I think those two

25   differences really distinguish our case from *Quadre*.

1          **THE COURT:**  So, Mr. Loft, let me just tell you that,

2   you know, prior to this hearing, having read everything, I was

3   inclined to grant your request to take a deposition.  But I am

4   concerned about that language in the directions order and

5   whether under the third *Intel* factor this is some kind of

6   circumvention.  And, so, that's -- you know, I only saw the

7   directions order yesterday, so that is something that I would

8   like to conduct some research on.  Certainly, you know, if you

9   want to brief it -- and, you know, I'm happy to entertain that,

10  but, you know, let me just quickly look at these four factors,

11  discretionary, again.

12          You know, I -- and I'm just going to give you my

13  preliminary thinking so that, if you do want to brief this

14  issue, I'm happy to hear it.  You know, Houlihan is a third

15  party, so it seems to me that that factor is kind of neutral,

16  really, or weighs in favor of petitioner.

17          The nature of the foreign tribunal, the character of

18  the proceedings underway abroad, and the receptivity of the

19  foreign government or court or agency abroad to the Court's

20  assistance; as I said, I -- my understanding of the law is,

21  basically, unless something's been -- see, I think -- I think

22  Mr. Loft, the argument you were making previously in response

23  to my concern about factor three actually goes to factor two,

24  because I do think you're right that factor two says that

25  unless the Court has affirmatively prohibited something, that

1   the presumption is that you should be able to gather that type

2   of evidence.  And I don't think there is an actual prohibition

3   on taking a deposition.  The character of the proceedings

4   underway abroad, however, is very narrow, and, you know,

5   whether a deposition is needed, I don't know; that's something

6   I'd have to think about.  But right now, I would say that that

7   factor probably tends to favor you.

8           But whether the request is an attempt to circumvent

9   foreign proof-gathering restrictions or other policies, it does

10  seem to me preliminarily, as I said, that they've set up a way

11  for somebody to be examined; they say that it takes place at

12  the end of the proceedings; and, so, allowing a deposition

13  might be -- and I haven't decided -- a way to circumvent that.

14          And, then, whether the request is unduly intrusive or

15  burdensome, I mean, given, you know, that there hasn't been a

16  showing -- you know, most of Mr. Flaum's argument concerning

17  burden went to producing the documents and the fact that they

18  had already given them to the company, etcetera, etcetera.  I'm

19  not sure how burdensome a deposition will be, especially since,

20  as Mr. Flaum said, somebody from Houlihan is, in any event,

21  going to be doing an affidavit and be cross examined.

22          So -- so, anyway, those are my preliminary thoughts.

23  It's that directions order -- I was inclined to let you do the

24  deposition, but the directions order is giving me pause about

25  the third factor.

1          **MR. FLAUM:**  Thank you, Your Honor.  I would just

2   point out we did brief the -- you know, they list, I think it's

3   six or seven categories they want to depose, and we did brief,

4   to some extent, that they were overly broad and burdensome.

5          **THE COURT:**  Right.

6          **MR. FLAUM:**  And, so, I just want to --

7          **THE COURT:**  You know, and you're -- I'm sorry.

8          **MR. FLAUM:**  I just want to (indisc.) that.

9          **THE COURT:**  I'm sorry if I -- if I implied otherwise.

10  But, to me, those were sort of the same -- or very similar

11  arguments related to why the document production was overbroad,

12  as well.

13         **MR. FLAUM:**  That's correct, Your Honor.

14         **MR. LOFT:**  Your Honor, may I just leave you with one

15  last point on the deposition, and then we can save the rest for

16  briefing?  This is the *Athos* case, a case that we cite at the

17  reply brief, ECF 31 at page 14.  Now, this was a case from the

18  Eastern District of Missouri.  Obviously, it's not binding on

19  this Court.

20         **THE COURT:**  Right.

21         **MR. LOFT:**  But it does show how another district

22  court grappled with this issue.  It was a Cayman Islands

23  appraisal proceeding.  The 1782 application sought a deposition

24  of a member of the buyer group; admittedly, not the financial

25  advisor, but a member of the buyer group.  And here's what the

1  Court said.  It said:

2  "The second and third discretionary factors encourage courts to

3  consider the foreign tribunal's receptivity to a U.S. Federal

4  court's assistance and whether the 1782 request conceals an

5  attempt to circumvent foreign proof-gathering restrictions.

6  There is no indication in the record here that a discovery

7  order would be unwelcome by the Cayman Islands court."

8  And the Court went on to allow a deposition exactly

9  in the form that we're seeking here, a 30(b)(6) deposition.

10  We're happy to negotiate about the topics and meet and confer

11  so that it's narrow enough that one witness -- not multiple --

12  one witness would appear for a deposition, and that can be a

13  witness of Houlihan's choosing to meet the topics under our

14  notice.

15  **THE COURT:**  Right, but I don't think that's exactly

16  on point, and I did have that case circled, because here,

17  again, you're right that there is no actual prohibition, that,

18  you know, the directions order is silent concerning a

19  deposition, but I have no idea if this *Athos* directions order

20  said anything comparable to what it says here about allowing an

21  affiant to be cross examined, etcetera.

22  **MR. LOFT:**  Yeah, I -- this is -- may -- this may be

23  an area for further briefing, but --

24  **THE COURT:**  All right.

25  **MR. LOFT:**  -- the cross examination of a witness at

1  this phase of a Cayman Islands appraisal proceeding I think is

2  standard across the Cayman Islands proceeding.  I have every

3  reason to suspect it existed in the *Athos* case, but we have

4  probably counsel on the phone here who were involved in that

5  case, and we can go away and brief that question and respond to

6  Your Honor.

7          **THE COURT:**  Well, that would -- that would be very

8  helpful, and then if there was any other -- it would be helpful

9  to me to know if that is standard operating procedure, because

10  then I think you're right.  It would be helpful to know if it

11  was in the *Incos* (phonetic) case, and it would be helpful to

12  know if there were any other cases out there.  You know,

13  obviously, you're probably not going to be able to find

14  something from our district or our -- maybe even our circuit,

15  but I do appreciate seeing stuff from elsewhere that's on

16  point.

17          So -- so, leaving aside the issue of whether any

18  deposition would be involved or allowed, let me take the

19  subpoena here.

20          So, Mr. Loft has already agreed that it can be

21  limited to April 1st, 2020, so that's one way it would have to

22  be modified.  Then -- and what I'm doing now is to give you

23  some guidance.  And then I'm going to order the parties to meet

24  and confer and come back to me, you know, and I can get the

25  briefing on the deposition, we can set a briefing schedule for

1    that, but I also want the parties to meet and confer concerning

2    the protective order, and then to meet and confer concerning

3    narrowing the scope of the subpoena request, and once I rule on

4    whether any deposition would be allowed, the deposition topics

5    would be narrowed accordingly, and then we can set a status

6    conference for some time after I get the briefing and

7    reconvene.

8          But just looking at page six of Exhibit 1 of the

9    proposed subpoena, starting with the document requests, you

10   know, I don't -- I don't -- I mean, I understand your

11   arguments, Mr. Loft, about how there might be some tangential

12   relevance to the valuation, but, number one, I just -- why do I

13   care about strategic alternatives to the merger?

14         **MR. LOFT:**  Because an essential part of the way to

15   determine whether a price was fair was whether it was open to

16   competitive bidding.  And in this case, it was not, or at least

17   we don't think it was, but if there were other parties

18   interested in buying this company who were turned away or not

19   otherwise considered, that would be highly probative of whether

20   the ultimate price -- which, again, was the product of what we

21   believe was an insider deal that squeezed out minority

22   holders -- was a fair price.

23         And I found the references in the Mangatal

24   declaration.  It's paragraphs 23 and 30, for the record, that

25   talk about whether the sales process was an open, competitive,

1    and fair process.

2              **THE COURT:**  All right.  Mr. Flaum?

3              **MR. FLAUM:**  Your Honor, that's not what -- Houlihan

4    was retained to do a fairness opinion.  That -- and, so --

5    their retention letter is there; they had a limited role.  This

6    is, you know -- this may be -- and, look, my guess is -- I know

7    there are at least two or three other 1782s that the dissenters

8    have -- are litigating elsewhere, served elsewhere.  And this

9    may be a proper request for, you know, the company, but it's

10   not -- it's not a proper request for (indisc.).  We have a very

11   -- we had a limited role of setting up and doing a fairness

12   opinion of the fairness of the thing from a financial point of

13   view.  That was what was our role.  And as a nonparty, to try

14   and put us through the burden of trying to, you know, do this

15   at best tangentially and speculatively relevant discovery, in

16   my view, makes -- you know, is improper under -- you know,

17   putting aside the Cayman, it was just improper under U.S. law.

18   We're not the right party.  We're a third party -- a nonparty,

19   rather, not a third party.  And this was not in our bailiwick

20   of what we were doing.  This is a fishing expedition as to us.

21             **THE COURT:**  But, then -- then -- then you wouldn't

22   have any responsive documents.  Do you know, one way or the

23   other, whether you have documents that are responsive to this?

24             **MR. FLAUM:**  I don't know.  I don't know whether or

25   not somebody at Houlihan -- you know, to the extent we had --

1  to the extent we have documents where we went out to third

2  parties or had communications with third parties, those we

3  have, and those we've produced.  To the extent there's, you

4  know, internal musings or other things that are about this

5  (indisc.), if we -- if there were others that we communicated

6  with or communicated with us, that's covered by other requests,

7  and we've produced them.

8          **THE COURT:**  Can somebody give me a little bit of a

9  timeline?  And I apologize if this is somewhere and I -- I have

10  forgotten it.  So, the merger takes place, and then Houlihan

11  comes in to do the valuation?  Or --

12          **MR. LOFT:**  Houlihan was retained In April of 2020.

13  They rendered a fairness opinion on June 15th, 2020, after the

14  company had agreed with the buyer group on an agreement in

15  principle to do the deal.

16          **THE COURT:**  Okay.  (indisc.)

17          **MR. LOFT:**  Houlihan offered an opinion in June that

18  the price was fair, and then the merger closed in September of

19  2020.

20          **THE COURT:**  All right.

21          **MR. FLAUM:**  So, Houlihan's involvement was -- you

22  know, April 27 we were retained, so there may be, you know, a

23  week or two where -- where we, you know, we put in a

24  competitive bidding situation and asked to be retained.  I

25  don't even know that, but I'll -- I'll -- I'm taking Mr. Loft's

1  word for that.  But it was basically from the end of April,

2  May, through June 15.

3         **THE COURT:**  Right.

4         **MR. FLAUM:**  That's the period.

5         **THE COURT:**  Right.  I'm going to -- I'm going to

6  limit it, I already said, from April 1, 2020, to -- you know,

7  I'll give you a little bit of time after September 6th, you

8  know, to the end of September.  That's the period we're talking

9  about now, April 1 to September 30th of 2020.  I mean, I did

10  look at the expert declaration paragraphs you pointed me to.  I

11  don't really see that 23 advances the ball, but 34 does say --

12  is given a very wide meaning.

13         **MR. LOFT:**  I misspoke, Your Honor.  I said 23, but I

14  meant paragraph 29.

15         **THE COURT:**  Twenty-nine.

16         **MR. LOFT:**  It's 29.

17     **(Pause)**

18         **MR. LOFT:**  This is where it talks about whether the

19  sale process was open, competitive, and fair.  The Court's

20  talking about the *Maso Capital* case.

21         **THE COURT:**  So, you're telling me that in these

22  proceedings -- what would happen if the -- does the Cayman

23  court ever find, okay, this -- this process was not open,

24  competitive, and fair, and, therefore, we're going to value it

25  at a much greater amount?  Is that part of this process?

42

1          **MR. LOFT:**  That's my understanding, and that's what

2     goes -- what the judge goes on to say in 30.  Where it talks

3     about ultimately how the Court will assess the fair value of

4     the shares, that is come up with a price that may be different

5     from this -- from the merger price and award damages on that

6     basis or award appraisal on that basis, and we'll consider

7     factual evidence submitted by the parties, including evidence

8     relating to the fairness or lack thereof of the process, that

9     led to the merger.

10          And on this question of Houlihan's involvement as to

11     communications with potential other bidders, we cite a very

12     long proxy statement.  I don't expect the Court has read the

13     whole thing; I haven't read the whole thing.  But there's --

14          **THE COURT:**  I've read some of it.

15          **MR. LOFT:**  There is a specific page.  It's at -- it's

16     at page ID 908, so that's the ECF page, and this is ECF 1-3.

17     And it talks about how when the proposal for the deal was

18     announced, the proposal specifically told the public that,

19     quote:

20      "Interested third parties should contact the special committee

21     or Houlihan Lokey to make their interest in an alternative

22     transaction known."

23          So, that's why we've made these requests.  That's why

24     we believe that Houlihan may have had such communications.  If

25     they didn't, if they don't have any communications, then upon a

43

1   reasonable search they'll establish that, and we'll get no

2   documents.  But we think that the search is justified on that

3   basis.

4           **THE COURT:**  All right.  I think that's fine.  I do --

5   we have greatly narrowed the time frame we're talking about,

6   and, as Mr. Loft says, if Houlihan doesn't have any documents,

7   then that won't be that much of a burden.

8           All right.  Number two.  So, that would be the same

9   ruling as to number two.

10          Number three; well, that's certainly relevant.  I

11  don't know who -- what is Anjuke and Daojia?

12          **MR. FLAUM:**  I believe they are subsidiaries of

13  58.com.

14          **THE COURT:**  All right.

15          **MR. FLAUM:**  To simplify it a little bit.

16          **THE COURT:**  All right.  So, you know, one, two,

17  three; that's fine.

18          Four; that's fine.

19          Five; any financial protection for the company.  I --

20  what -- explain to me, Mr. Loft, what -- what this means

21  exactly and what you're looking for.

22          **MR. LOFT:**  This is five?

23          **THE COURT:**  Yeah.

24          **MR. LOFT:**  There may be a typo.  It should say

25  financial projection.

1        **THE COURT:**  Oh, it does.  I'm sorry.  My eyes are

2   bad.  All right.  Now I get it.  All right.  That's fine.

3        What -- so --

4        **MR. FLAUM:**  Your Honor, if I could just say, you

5   know, I understand -- I mean, five is -- even corrected for the

6   eyesight -- it's a very confusing question, you know, in my

7   mind, and it's -- I think I know what it -- and I'm happy to

8   discuss it with Mr. Loft what he's, you know, really looking

9   for, but it has a lot of, you know -- is he -- if what he's

10  just saying is, if there are any financial projections -- I

11  don't understand what's different about it than prior requests.

12  That's my problem with it.  I read it, and I'm, like, I don't

13  know what he's asking for that wouldn't be covered by three,

14  for example.  So, it -- it just, you know, makes it difficult

15  to say I'm okay producing it if I don't know what he wants.

16        **MR. LOFT:**  There are two --

17        **THE COURT:**  Well, that's a fair point.

18        Go ahead, Mr. Loft.

19        **MR. LOFT:**  There are two types of financial

20  projections that become relevant in these appraisal cases.

21  There are financial projections that project the company's

22  revenues on a standalone basis without the merger, and then

23  there are projections that project the company's revenues and

24  profits after the merger, as a combined company, based upon

25  potential synergies, etcetera.  And that's the difference

1   between request five and request four.  We wanted to make sure

2   we had a request that covered projections not only on a

3   standalone basis, but also on a merged basis.

4            THE COURT:  Well, the end of three says --

5            MR. FLAUM:  Right.

6            THE COURT:  -- "and/or qualitative or quantitative

7   discussions or analysis of any synergies from the merger."

8            So -- but you folks can meet and confer about that.

9            MR. FLAUM:  We can -- I'm sure we can work that one

10  out.  I just didn't understand what he was asking for.

11           THE COURT:  And I appreciate it.

12           Number six, relating to any other potential

13  acquisition of the company.  So, I take it that you're saying,

14  Mr. Loft, that if they were about to acquire Facebook, that

15  would have boosted the value or something?

16           MR. LOFT:  Correct.  Correct.  That's what that one

17  goes to.

18           THE COURT:  All right.

19           MR. FLAUM:  And we're still dealing with the same

20  four-month or so time frame.

21           THE COURT:  Yes.  All of this is --

22           MR. FLAUM:  Okay.

23           THE COURT:  -- yes.  So, okay.  And, in principle,

24  I'm saying okay to these, but you folks can meet and confer,

25  but, Mr. Flaum, keep in mind that my, you know, tentative

46

1   notion is that they're okay, limited to that time frame.

2           Number seven; that seems okay.

3           Number eight; that seems okay.

4           Number nine seems okay.

5           Number ten.

6       **MR. FLAUM:**  All -- through 12 is stuff we've already

7   handed over to the company, so (indisc.) to.

8       **THE COURT:**  Well, again, I do think that they are

9   entitled to test -- Mr. Loft, when you go over this stuff, I --

10  so, to the extent you have access already, and I don't know if

11  you do, to the documents that the company has uploaded to the

12  data room, if you can avoid asking Mr. Flaum to produce the

13  exact same stuff, I would appreciate it.

14      **MR. LOFT:**  Understood.

15      **THE COURT:**  All right.

16          But 10 and 11; you know, to the extent there's any

17  nonprivileged stuff, it's okay.

18          Number 12; that's fine.

19          Number 13; what's Kaihui (phonetic) Limited?

20      **MR. LOFT:**  Kaihui Limited, or KL, as it's

21  abbreviated, was a consultant to the company and its management

22  and was intimately involved in negotiations of this

23  transaction.  They're detailed throughout the proxy statement.

24  And, so, this is meant to capture the communications with them.

25      **THE COURT:**  All right.

1          So, number 14; all documents concerning any condition

2    that the merger be approved by a majority of the shares not

3    held by the buyer group and its affiliates.

4          So, this is trying to get to the fairness issue?

5          **MR. LOFT:**  That's right.  There's a condition that

6    didn't exist in this case, but that could exist to protect

7    minority shareholders, where, like in Delaware, you would put

8    the transaction up to a vote by disinterested shareholders, who

9    aren't affiliated with the buyer group, a majority of the

10   minority condition.  That's what this is going to.  We're

11   looking for documents considering, but ultimately, obviously,

12   rejecting that, but what the considerations were that caused

13   them to reject that type of condition for this deal, which

14   would have made the deal a lot fairer to our clients.

15         **MR. FLAUM:**  And this is -- this is, in my view --

16   this is where, I think, up till now, it sort of relates to the

17   work Houlihan was retained to do and issue a fairness opinion,

18   whether they -- you know, the transaction was fair from a

19   financial point of view.  This is now going into -- you know,

20   it asks whether -- you know, this was not something Houlihan

21   had any role in.

22         **THE COURT:**  But wouldn't Houlihan -- I don't know,

23   but wouldn't Houlihan have considered whether this condition

24   was not present that affected the fairness of the valuation?

25         **MR. FLAUM:**  No.  That's not -- that's not what it

48

1    does.  I mean, it ran, you know, this kind of cash flow

2    analyses, comparable company analyses, and came up with -- you

3    know, it came up with what I believe the Caymans court will do,

4    which is, what is the fair price of this deal.  It didn't say,

5    you know, if the deal was, you know, that it would close in six

6    months rather than now, or other conditions that didn't exist.

7    There are probably a host of conditions that, you know, you

8    could have put in the deal but didn't.  You know?  It could be

9    conditions about, you know, how long certain employees stay

10   with the company; and there's all sorts of things.  That's not

11   what Houlihan did --

12            THE COURT:  So, then, wouldn't you --

13            MR. FLAUM:  -- or was retained to do.

14            THE COURT:  But, so, then, wouldn't you just be able

15   to say you had no responsive documents?

16            MR. FLAUM:  I'm not sure how we, you know, even

17   search for this.  I mean, you know, we're not going to have

18   a -- you know, could somebody have, you know, had a musing?  I

19   have no idea.  I'm not even sure how we go -- this is just not

20   what -- I'm not sure how we would search for -- for the -- for

21   documents like this, because it was not the work that we did.

22            And there are -- again, there are parties that made

23   these decisions.  I think we'll get the discovery from the

24   parties.  This was -- I mean, the company decided, I'm sure in

25   negotiation with the buyer group, what conditions to have or

49

```
 1   not have.  And there's just -- you know, it's just -- I don't
 2   believe it's appropriate to make a nonparty search for needles
 3   in a haystack when there are obviously parties that are the
 4   ones that did this issue.
 5          THE COURT:  Well, I understand what you're saying,
 6   but I also understand Mr. Loft's argument that it goes to
 7   whether the merger was fair and, therefore, whether the
 8   valuation was fair.
 9          But, Mr. Loft, when you folks meet and confer, you
10   better, you know, provide Mr. Flaum with a way to search
11   effectively and efficiently to come up with these responsive
12   documents, the search terms that you want him to use, because I
13   don't want him having to -- I think he's probably right, that
14   there's not going to be a lot, based on what he's saying, so I
15   don't want him to have to spend a lot of time searching for
16   something that he most likely doesn't have a lot of anyway.
17          MR. LOFT:  Yeah, Your Honor, just for the record,
18   there are at least four meetings referenced in the proxy
19   statement that speak exactly to this issue, that say Houlihan,
20   with its special committee, discussed specifically whether the
21   proposed transaction would be approved by a majority of the
22   outstanding shares held by unaffiliated shareholders.  This is
23   all throughout the proxy statement.  Mr. Flaum may not know,
24   but his client will know what we're talking about when we send
25   these requests to them.
```

1          **THE COURT:**  All right.

2          Number 15; that's fine.

3          Number 16; I mean, that number 16 seems rather

4    tangential to me.  I -- why is Houlihan going to have anything

5    about the negotiation of the merger agreement, and -- I mean, I

6    guess I'm not sure exactly what you're asking for, Mr. Loft.

7          **MR. LOFT:**  Throughout the negotiation process of the

8    merger agreement, at every step, the special committee would be

9    presented with the latest developments on the negotiations.

10   They were then discussed in the special committee; Houlihan was

11   advisor to the special committee.  So, Houlihan would have been

12   living and breathing in real time the negotiations as they were

13   unfolding, from the perspective of the special committee, but

14   certainly with great visibility into those negotiations.

15         **THE COURT:**  But isn't this essentially asking for

16   every single piece of paper that Houlihan has?

17         **MR. FLAUM:**  Yes.

18         **MR. LOFT:**  We're happy to work with search terms;

19   we're happy to work with custodians.  We're not trying to turn

20   the company upside down.  But  Houlihan had a very prominent

21   role in this deal, and if there are search terms that don't

22   yield an undue burden, then that discovery is highly

23   proportional to a multi-billion-dollar dispute in this case.

24         **THE COURT:**  But you've got all these other specific

25   ones.  I -- I just -- I don't think this one's necessary, and I

1    don't think it's -- it's -- I think it's too vague also.  So, I

2    don't think we need 16.

3              Seventeen; all right.  I think that's all right.

4              Eighteen; what does 18 bear on, Mr. Loft?

5         **MR. LOFT:**  Eighteen bears on the interconnections

6    between the buyer group.  There are a number of buyers who came

7    together to acquire this company, many of which had close ties

8    to management.  This was a take-private deal led by the

9    managers of the company and who combined with private equity

10   firms to buy the company and take it private.  So, that's what

11   the affiliate relationships go to.

12             **THE COURT:**  But the -- as Mr. Flaum mentioned, don't

13   you have 1782 requests out to the members of the buyer group?

14             **MR. LOFT:**  To the ones who were in the United States.

15             **THE COURT:**  Ah.  Mr. Flaum?

16             **MR. FLAUM:**  Look, I think what's -- what's going on

17   here is, you know, their company used Houlihan as the mechanism

18   to do what would be -- you know, if this case were in the

19   United States and they had the ability to subpoena, they're

20   saying:  We would have subpoenaed 25 people who have really --

21   who have the core information; we can only subpoena three of

22   them, and you're one of them, so we're going to ask you for

23   everything we would have asked for everybody else, even though

24   you're a nonparty, and say, well, you sat in a meeting, so --

25   anyway, my view, Your Honor, is -- and I could be wrong; it's

1   up to you -- that's improper.  That's what's going on here.

2   It's a big fishing expedition into parties and into issues we

3   have nothing really to do with, because they don't have --

4   they're basically going after the three or four people that are

5   in the United States, and Mr. Loft just admitted.  And, you

6   know, but even with this one, they have buyer group people they

7   can go after.  And those people (indisc.) --

8            THE COURT:  Yeah, I just --

9            MR. FLAUM:  (indisc.)

10           THE COURT:  I agree with you.  I think I agree with

11  you, Mr. Flaum.  So, I just -- you know, this just seems too

12  tangential both to Houlihan and to what's at issue in the

13  proceeding, so I'm going to say no to 18.

14           Nineteen; well, that's fine.

15           MR. FLAUM:  I'm not sure -- if I could, Your Honor; I

16  don't mean to interrupt.  I'm not sure what 19 -- again, maybe

17  I could just talk to Mr. Loft about this.  You know, (indisc.)

18  they want, you know -- including associated discussion papers

19  that we (indisc.) in connection with our role, as long as it's

20  limited to just things we did here, and this is not some

21  attempt to get every document that Houlihan has somewhere

22  concerning, you know, fairness opinion or valuation reports, I

23  mean, that would be searching throughout -- I mean, that's what

24  Houlihan does.  So --

25           THE COURT:  Well, I under --

1          **MR. FLAUM:**  -- that this (indisc.) --

2          **THE COURT:**  And I think --

3          **MR. FLAUM:**  (indisc.)

4          **THE COURT:**  I agree with you, but I think that

5    because it says, "in connection with your role as a financial

6    advisor to the special committee," it's -- it's limited to this

7    case.

8          Mr. Loft, you didn't mean anything different, did

9    you?

10         **MR. LOFT:**  That's absolutely right.  And "fairness

11   opinion" is a defined term.  It's defined as the fairness

12   opinion issued in connection with this -- with this

13   transaction.

14         **THE COURT:**  All right.  So, that's fine.

15         Number 20; I mean, I guess that's okay.  I mean,

16   maybe it should -- it seems to me more appropriate that number

17   20 and number 21 would say something like -- where you have

18   "concerning the company," maybe it should say, "relating to the

19   valuation of the company."

20         **MR. FLAUM:**  That would -- that would work for me,

21   Your Honor.

22         **THE COURT:**  Because "concerning the company" --

23         **MR. LOFT:**  That's fine.

24         **THE COURT:**  -- is mighty broad.  All right.  So,

25   we'll change that to "relating to the valuation of the

1    company."

2         All right.  Number 22; I guess -- I don't know, I

3    guess that's -- I mean -- I mean, again, maybe at the end of

4    this it should -- should say, you know, something limiting it

5    to this transaction, the merger at issue here.

6         **MR. LOFT:**  That's fair.

7         **THE COURT:**  All right.  So, add that on at the end.

8         **MR. FLAUM:**  I think 23, Your Honor, with the date,

9    since the appraisal proceeding didn't happen till more than two

10   months after your -- the date cutoff now, I don't think --

11        **THE COURT:**  Let me just read this.

12        **MR. FLAUM:**  -- it would be anything.

13        **THE COURT:**  Yeah, I don't -- I don't see that that's

14   appropriate, number 23, Mr. Loft.

15        **MR. LOFT:**  Understood, Your Honor.

16        **THE COURT:**  All right.

17        Twenty-four; I mean, you know, this seems

18   duplicative, but I -- you know, you folks can talk about how to

19   make sure everything's covered that's appropriate.

20        **MR. LOFT:**  Yeah.  And that's true for 25, as well.

21        **THE COURT:**  All right.

22        I mean, as long as we're -- I mean, with the time

23   frame limit, I guess number 26 is okay.  Basically, if Houlihan

24   was aware during that -- you know, from April to September of

25   any potential IPO.

1          **MR. FLAUM:**  All right.

2          **THE COURT:**  All right?

3          Number 27; it's the same consideration as number 24

4     and number 25, so you can talk about that.

5          **MR. LOFT:**  Yeah; same for 28.

6          **THE COURT:**  All right.  Yeah, same for 28.

7          All right.  So, those are my thoughts about that.

8          So, we need to -- so, I'm going to order you folks to

9     meet and confer promptly concerning, you know, a reduced

10    subpoena and the protective order, and then I'm going to set a

11    briefing schedule.  I don't want stuff re-argued, because I

12    have read everything thoroughly, so why don't we set a page

13    minimum.  I'm going to give you each ten pages, and I want it

14    limited to the question of the deposition analyzing the four --

15    and I know you've already done it to some degree, but given --

16    in light of the new directions order, analyzing the four

17    discretionary *Intel* factors.

18         So, Mr. Loft, when can you file your brief?

19         **MR. LOFT:**  We could file our brief by -- I'm just

20    looking.  I'm conscious of the Thanksgiving holiday.

21         **THE COURT:**  Yeah, I don't want to interrupt anybody's

22    Thanksgiving.

23         **MR. LOFT:**  Could we have until -- until December 3rd?

24         **THE COURT:**  Mr. Flaum, is that all right with you?

25         **MR. FLAUM:**  That's fine.

56

1          **THE COURT:**  All right.  And, then, Mr. Flaum, your

2  opposition?

3          **MR. FLAUM:**  I'm just looking at my calendar, as well.

4  Give me a second.  The third is a Friday.  How about the 20th?

5          **THE COURT:**  Mr. Loft, is that all right with you?

6          **MR. LOFT:**  That's fine, Your Honor.

7          **THE COURT:**  All right.

8          **MR. LOFT:**  And may I just clarify?  We'll certainly

9  keep our legal briefing to 10 pages.  I expect we can do it in

10  a lot less.  But may we have leave to submit additional

11  supporting declarations from Cayman counsel and any Cayman

12  authorities?

13          **MR. LOFT:**  Sure.  I don't see why not, unless --

14  Mr. Flaum, do you have an objection?

15          **MR. FLAUM:**  Not at all.

16          **THE COURT:**  All right.  And, then, Mr. --

17          **MR. FLAUM:**  We would, obviously, want the same --

18          **THE COURT:**  Oh, right.

19          **MR. FLAUM:**  -- you know, thing.

20          **THE COURT:**  Sure.  Please try not to give me hundreds

21  of pages of anything.

22          But, Mr. Loft, a reply brief?

23          **MR. LOFT:**  Um --

24          **THE COURT:**  Now we're into Christmas, I know.

25          **MR. LOFT:**  No, that's -- we could do a reply brief by

1   the 31st.

2           **THE COURT:**  All right.

3           All right.  And, then, why don't we set another

4   hearing, you know, for after that?  So, let me look at my

5   calendar.  One second.

6      **(Pause)**

7           **THE COURT:**  All right.  So, Thursday, January 6th,

8   are folks available?

9           **MR. FLAUM:**  That works for me, Your Honor.

10          **MR. LOFT:**  It's fine for me.

11          **THE COURT:**  All right.  And, so, we'll set that at

12  10:00 a.m., January 6th.  And I expect, as well, at that

13  hearing, if not before, for counsel to submit a -- you know,

14  this would come from Mr. Loft -- a proposed reduced subpoena

15  after your meet-and-confer so that I -- if you could submit

16  that no later, Mr. Loft, than with your reply so that I have a

17  chance to look it over, and please indicate somehow if there

18  are any portions of the subpoena, given my guidance, that are

19  still disputed.

20          **MR. LOFT:**  Will do.

21          **THE COURT:**  All right?

22          **MR. LOFT:**  Will do.

23          **THE COURT:**  And, so, I'm going to deny the request

24  for the cost shifting without prejudice.

25          Am I forgetting anything?

58

1          **MR. FLAUM:** I'll have to admit, Your Honor, you've

2   been very thorough, and we certainly appreciate it.

3          **THE COURT:** Thank you.  I try.

4          All right.  So, happy holidays to everybody.  I'll

5   look for your briefing, and I'll see you on January 6th.

6          **MR. FLAUM:** Thank you.

7          **MR. LOFT:** Thank you, Your Honor.

8          **THE COURT:** All right.  Thank you.

9          **THE CLERK:** This court is now adjourned.

10          **(Proceeding was adjourned at 11:25 a.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____         __November 22, 2021__

Signed                          Dated

*TONI HUDSON, TRANSCRIBER*