UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | |
|---|---|
| FOUR WORLD EVENT OPPORTUNITIES, LP, ET AL, | CASE NO: 2:21-MC-1019-CAS-JPRx |
| Petitioners, | CIVIL MISCELLANEOUS |
| vs. | Los Angeles, California |
| HOULIHAN LOKEY, INC, | Thursday, January 6, 2022 |
| Respondent. | (10:04 a.m. to 11:09 a.m.) |

SUPPLEMENTAL HEARING

BEFORE THE HONORABLE JEAN P. ROSENBLUTH,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                    CONT'D ON PAGE 2

For Petitioners:          DUANE L. LOFT, ESQ.
                          Boies Schiller Flexner, LLP
                          55 Hudson Yards
                          New York, NY 10001
                          212-446-2300

For Respondent:           DOUGLAS H. FLAUM, ESQ.
                          Goodwin Procter, LLP
                          620 Eighth Avenue
                          New York, NY 10018
                          212-813-8800

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Bea Martinez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:                (CONTINUED)


For Petitioners:           JOHN KUCERA, ESQ.
                           Boies Schiller Flexner, LLP
                           725 S. Figueroa Street
                           31st Floor
                           Los Angeles, CA 90017
                           213-995-5758

                           CHRISTINE MACKINTOSH, ESQ.
                           Grant & Eisenhoffer P.A.
                           123 South Justison Street
                           Wilmington, DE 19801
                           302-622-7081

                           IRA A. SCHOCHET, ESQ.
                           Labaton Sucharow, LLP
                           140 Broadway
                           New York, NY 10005
                           212-907-0700


For Respondent:            GALEN PHILLIPS, ESQ.
                           Goodwin Procter, LLP
                           601 S. Figueroa Street
                           41st Floor
                           Los Angeles, CA 90017
                           213-426-2500

                           ALEXANDRA BARGOOT, ESQ.
                           Goodwin Procter, LLP
                           100 Northern Avenue
                           Boston, MA 02210
                           617-570-1213


For Intervenor:            TIMOTHY G. NELSON, ESQ.
                           Skadden Arps, et al.
                           300 S. Grand Avenue
                           Suite 3400
                           Los Angeles, CA 90071
                           213-687-5600

1      **Los Angeles, California; Thursday, January 6, 2022; 10:04 a.m.**

2                    **(Remote appearances via Zoom)**

3                         **(Call to Order)**

4          **THE CLERK:**  Calling Case Number 21-mc-1019-CAS(JPRx),

5   FourWorld Event Opportunities, LP, et al. versus Houlihan

6   Lokey, Inc.

7          Counsel, please state your appearances for the

8   record, beginning with Petitioners.

9          **MR. LOFT:**  Good morning, Your Honor.  Duane Loft for

10  the Petitioners.  And I'm joined by, first, my California

11  partner, John Kucera, and then our cocounsel, Christine

12  Mackintosh and Ira Schochet.

13         **THE COURT:**  All right.  And are any of them going to

14  be speaking or --

15         **MR. FLAUM:**  If I may?  For some reason my audio is

16  not working so this is Mr. Flaum for Houlihan.

17         **THE COURT:**  So you cannot hear us?

18      **(No audible response)**

19         All right.  So Ms. Martinez, it looks like he can't

20  hear us so --

21         **THE CLERK:**  It must be on his end, Judge, because

22  everyone else can hear us so --

23         **THE COURT:**  So maybe you could try to contact him and

24  tell him that.  Do you have a way to email him or call him?

25         **THE CLERK:**  And that is -- that is whom, Judge?

```
 1                THE COURT:  That is Respondent's counsel, it is

 2   Mr. --

 3                MR. LOFT:  Douglas Flaum.

 4                THE COURT:  Thank you, that's right.

 5                THE CLERK:  Okay.

 6                THE COURT:  Mr. Flaum.

 7                THE CLERK:  Okay, thank you.

 8                THE COURT:  Mr. Flaum, can you hear me?

 9           (No audible response)

10           No.  All right.  So if you can contact him.  I'm

11   going to mute myself until you tell me we're ready.

12                THE CLERK:  Okay, thank you, Judge.

13                THE COURT:  Okay.

14           (Pause from 10:06:19 a.m. to 10:09:02 a.m.)

15                THE COURT:  Mr. Flaum, can you hear me?

16           (No audible response)

17           (Pause from 10:09:05 a.m. to 10:10:05 a.m.)

18                MR. NELSON:  Your Honor and Madam Clerk, it's Tim

19   Nelson here for the Intervening Party, 58.Com.  Mr. Flaum has

20   emailed me his telephone number if that at all helps?

21                THE COURT:  All right.  If you could say it out loud

22   for Ms. Martinez, that would be great.  I think what happened

23   is the Court erroneously sent out a Zoom on the Motion to

24   Intervene and maybe he's using that to try to log in, whereas

25   we're all on the Supplemental Hearing Zoom that was the correct
```

1    one.  I don't know; but yes, if you could give her the phone

2    number.

3            **MR. NELSON:**  Thank you, Your Honor.  212-813-8884,

4    that's 212-813-8884.

5            **THE CLERK:**  Thank you.

6            **THE COURT:**  Thank you.

7        **(Pause from 10:11:00 a.m. to 10:12:49 a.m.)**

8            **MR. FLAUM:**  Is this working?

9            **THE CLERK:**  Okay.  Can you --

10           **MR. FLAUM:**  Can Someone speak?

11           **THE CLERK:**  -- hear us now?

12           **MR. FLAUM:**  I can hear very faintly but I can hear.

13           **THE COURT:**  All right.  So Mr. Flaum, you can hear us

14   now?

15           **MR. FLAUM:**  I can, thank you.  I apologize for that.

16           **THE COURT:**  All right.  Well, I don't have a problem

17   speaking loud.  If everybody else could perhaps do so, maybe

18   that would help.  And I don't know if it'll help to turn up the

19   volume on your -- if you have external speakers or anything

20   like that.

21           **MR. FLAUM:**  All right.

22           **THE COURT:**  But Ms. Martinez, why don't you call the

23   case again.

24           **THE CLERK:**  Okay.  Recalling Case Number 21-mc-1019-

25   CAS(JPRx), FourWorld Event Opportunities, LP, et al. versus

**EXCEPTIONAL REPORTING SERVICES, INC**

1    Houlihan Lokey, Inc. Dot Com -- I'm sorry -- Inc.

2          Counsel, please restate your appearances for the

3    record, beginning with Petitioners.

4          **MR. LOFT:**  Duane Loft from Boies Schiller Flexner for

5    Petitioners.  I'm joined by my partner in California, John

6    Kucera, as well as our cocounsel, Christine Mackintosh and Ira

7    Schochet.  I'll be the one speaking today, Your Honor, to

8    answer your last question.

9          **THE COURT:**  Thank you.

10          **MR. FLAUM:**  This is Douglas Flaum from Goodwin on

11    behalf of Respondent.  I'm here with two of my colleagues,

12    Galen Phillips and Alexandra Bargoot.  In addition, I've

13    invited a new first year who's not yet admitted to listen in

14    and that's Austin Collier (phonetic) if that's okay with the

15    Court.

16          **THE COURT:**  Sure.  And I apologize.  Apparently there

17    was a problem at the last hearing with some folks listening in.

18    And this is obviously a public proceeding so anybody can attend

19    who wants to, so I apologize for that.  I hope we've resolved

20    that and everybody who wants to be here is here.

21          I do ask that anybody who is not speaking, please

22    mute their video.  It looks like everybody has so that I don't

23    have a bunch of faces staring at me.

24          All right.  So --

25          **MR. NELSON:**  And --

1           **THE COURT:**  Oh, go ahead.

2           **MR. NELSON:**  Sorry, Your Honor.  Timothy Nelson from

3    Skadden Arps Slate Meagher and Flom for the Intervening Party,

4    58.Com.

5           With me is -- are my colleagues, Adam Lloyd

6    (phonetic), Jim Brown, both of whom have made an appearance.

7    And similarly, a first year associate, one of my colleagues,

8    Aiden Headler (phonetic), is on the line as well, Your Honor.

9           **THE COURT:**  All right.  That's fine.  And you don't

10   have to mute because you are lead counsel for the Intervenor.

11          I am going to just take one second to increase the

12   volume on the external speakers of my computer so give me one

13   second.

14      **(Pause)**

15          All right.  So I have reviewed the supplemental

16   briefing, the brief, the opposition, and the reply, as well as

17   all of the supplemental declarations.  I went back and I

18   reviewed the original briefing as well, and I looked at a lot

19   of the cases.  I can't say I looked at every single one but I

20   read a lot of them.

21          I think that this is really honestly a close call.

22   And frankly, when you layer on top of that the discretion that

23   the Court has under Intel, it really could go either way but I

24   have carefully looked at the cases and I think overall it seems

25   appropriate to allow the deposition and I'm going to tell you

1   why and then I can certainly hear from Mr. Flaum.

2           So nobody disputes that the three mandatory factors

3   of Intel are all satisfied here so it's really a question of

4   the four discretionary factors.  And I tend to think that all

5   of them, except perhaps the first, counselled toward allowing

6   the deposition.

7           As to whether Houlihan is a participant in the

8   foreign proceeding, I think that factor is kind of neutral

9   because on the one hand it has said that it will submit an

10  affidavit and be subject to cross examination.  And once it is

11  -- once it has submitted that affidavit and is subject to cross

12  examination, certainly the Cayman Islands court has some

13  control over it.  It can allow certain questions and not,

14  et cetera, et cetera, but this factor does look at the

15  jurisdiction of the court to order the party to do certain

16  things.  And here, at least until Houlihan submits this

17  affidavit, it seems to me based on the expert declarations that

18  I read, the two from Judge Mangatal -- which I'm probably not

19  pronouncing correctly -- and then the one from Judge Henderson,

20  they seem to agree that at least until Houlihan submitted such

21  an affidavit, that there's nothing that the Cayman Islands

22  court could do to compel anything about Houlihan taking place.

23  Now, certainly they're officers of the court and they have made

24  this representation and I accept that but there is no

25  participation yet and so I sort of think that factor is

1    neutral.

2              As for the nature, character and receptivity of the

3    foreign tribunal, I think it's somewhat significant that the

4    Seamans case (phonetic) which quotes a Second Circuit in saying

5    that the standard is that the party opposing has to show

6    authoritative proof that the court would reject the evidence.

7    That case is Judge Snyder who is also the district judge here.

8    So to the extent Respondents chose to appeal any ruling I make,

9    she's the one who would be reviewing that so I have to assume

10   that even though it's a district court decision and not binding

11   on me, that that's the standard that she would apply.

12             And I think that here we've got these dueling expert

13   declarations, you know, that in some circumstances and as to

14   some aspects of the issues here are diametrically opposed.  But

15   even if I accept Judge Henderson's declaration, he does not say

16   that the evidence would be rejected.  He says it might be

17   inconsistent with the Cayman Islands' law -- which of course

18   Judge Mangatal disagrees with -- but he stops short of saying

19   that it would be rejected.  He does say that the -- anything

20   concerning the credibility of the witness would not be allowed

21   and Judge Mangatal seems to agree but what I would assume would

22   happen then is that as in Lixor (phonetic) -- or however you

23   say it -- the Cayman Islands court would simply excise from the

24   deposition anything that went to the credibility and might

25   allow other stuff.  So I don't think I have any authoritative

1   proof that this deposition would not be considered, at least as

2   to some parts of it by the Cayman Island court.

3          Now, I have to say if I were ruling on United States'

4   law and I read paragraph 42 of the Direction's Order, it seems

5   to me the plain language of it to be pretty categorical when it

6   says "Any fact must be submitted by affidavit."  Now to me, if

7   I were interpreting that, that means that all facts, you know,

8   there are no facts other than those that will be allowed, that

9   everything that will be allowed must come in by affidavit and

10  then the person must be cross examined.  But both of the

11  experts -- and as well as Mr. Kish (phonetic), say that that is

12  not in fact the law in the Cayman Islands and that there are

13  provisions sometimes for people to be examined orally, et

14  cetera, et cetera.  So despite the plain language of paragraph

15  42, in light of those expert declarations, I don't think it's

16  appropriate for me to interpret it that way.

17         I do think it's a bit odd as well that -- if I'm

18  reading this correctly -- and interpreting what the experts and

19  everyone else is arguing -- it seems to me odd that a third

20  party like Houlihan would be subject to deposition and -- as

21  well as submitting an affidavit and being cross examined at

22  trial, but a party could not be deposed and then submit an

23  affidavit and be cross examined at trial.  Maybe I'm reading

24  that wrong but if I'm reading that correctly and that's the

25  interpretations of the law that the parties and the experts are

1    giving me, that seems to me odd and anomalous but nonetheless I

2    think overall there is no authoritative proof that the Cayman

3    Island court would reject the evidence and therefore I think

4    that factor is for Petitioner, as well as the third factor

5    which is related, circumventing proof-gathering rules and

6    policies.

7            It does seem that the Cayman Island court seem to

8    look at whether the party seeking the evidence is acting

9    oppressively or unconscionably and I don't think that's the

10   case here, nor do I think Respondents are even arguing that.

11   The fact, as Judge Mangatal says, that the Cayman Islands law

12   itself doesn't -- circumstances -- some circumstances allow for

13   oral depositions, you know, seems to me to suggest that a

14   deposition is not going to contravene or circumvent the general

15   policies of the Cayman Islands concerning proof gathering.  As

16   a matter of fact, Petitioners have no control over or any

17   knowledge of what the 30(b)(6) declarant is going to put in

18   Houlihan's affidavit.  And so unlike a deposition where they

19   can ask questions that they propose, it seems to me it's not

20   entirely duplicative as Respondent has argued.

21           Let's see.

22           And then finally, whether it's unduly burdensome,

23   again, the Lixor and other -- Mack (phonetic) cases seem to

24   suggest that as in the United States, subjecting someone to a

25   deposition and then also having them testify at trial is not

1   doubling up or unnecessarily duplicative.

2          It seems to me too that since Houlihan has

3   represented that it is going to submit an affidavit and subject

4   deponent to be cross-examined at trial, that also then being

5   deposed mitigates some of the burden because he's going to have

6   to prepare anyway.  My understanding is I think that that

7   affidavit gets submitted in April so depending upon the timing

8   I guess of the deposition, either he will have already prepared

9   somewhat by preparing the affidavit or he would have to --

10  preparing for the deposition would lighten the burden of

11  preparing the affidavit.  So I don't see that it's unduly

12  burdensome and I haven't heard a good argument from Respondents

13  as to why it would be.

14         So I'm sympathetic to some of what Houlihan has

15  argued but I'm trying to just apply the factors as the law

16  suggests and I think the law overall generally favors allowing

17  the evidence unless -- under 1782 unless one of these factors

18  counsels against it -- one or more of them, really, because you

19  have to balance them.

20         So that's my overall thinking.  And certainly, if I

21  do allow the deposition, we can talk then about the categories

22  which I know Mr. Flaum has raised some objections to.

23         So Mr. Flaum, did you want to respond?

24     **MR. FLAUM:**  Your Honor, I appreciate it and obviously

25  I wish you were leaning the other way but let me take a crack

1    at trying to change your mind.

2         And I think the key issue here is to go back to your

3    initial question that you asked us at the last hearing which is

4    a good question which is whether in light of the Direction's

5    Order, whether this deposition would be inconsistent with the

6    factfinding apparatus and method being set up in the Cayman

7    Island pursuant to the Cayman Island Direction Order.  And I

8    think the answer to that question is clearly yes and I think

9    that is what Judge Henderson has said.  But I think the key

10   thing here is the focus on what the Direction Order says.

11        And I think, look, Your Honor has, to your credit,

12   has really tried I think to -- I'll call it "comity" -- but has

13   really tried to balance the competing efforts of this court and

14   that court and tried to come to the right place.  And I think

15   the Cayman's court, likewise, has tried to act with comity and

16   not been heavy-handed and said, you know, you can't use 1782

17   and a U.S. court can't decide the proper scope and whether it

18   should be allowed.

19        But I think if you read carefully the Direction's

20   Order, you'd come to a different conclusion than the one you're

21   leaning toward and I think the key thing is to look at

22   paragraphs 50 and 51, as well as 42.  And --

23        **THE COURT:**  I do -- I will say, just to -- I read

24   those and they do seem to apply to documents and not

25   depositions, if that's what you're going to say, but they're --

**14**

1  I believe that Petitioners' expert says that it encompasses

2  depositions.  I interrupted you so --

3       **MR. FLAUM:**  I think Your Honor -- that is (indisc.)

4  to say but I think it is important that I think, look, Your

5  Honor can -- or our expert clearly says the opposite.  And I

6  think just the normal way one would construe and construct the

7  document leads one to say it does -- if you look at paragraph

8  50, all 50 says is that we recognize people could go at 1782 or

9  other methods to do discovery and you have to give notice and

10 what that means is what it says.  You have to give notice and

11 it's not saying you can always use them or use them as broadly

12 or however you want, it's saying we're not saying you can't but

13 give the other side notice and they -- as Judge Henderson says

14 -- then have a right to object to.

15      And then importantly if you look at 51, what 51 says,

16 it specifically directs (indisc.) disclose probably any and all

17 documents received.  It could say "any and all evidence

18 received".  It doesn't say that.  It just says "documents".

19 And I think that's important.  I think that's, to be honest,

20 why I think Judge Mangatal -- if I'm pronouncing it right -- is

21 wrong when she argues that the fact that there is absolutely no

22 provision in the Direction Order for a deposition doesn't mean

23 anything because it talks about -- it allows it.  It doesn't.

24 It says 1782s can get documents and those documents will then

25 be disclosed.

1          **THE COURT:**  Mr. Flaum, can you point me to where in

2     Judge Henderson's declaration he says that that only means

3     documents and not depositions?

4          **(Pause)**

5          I did read it, obviously, but I don't recall that.

6     And take your time.

7          **(Pause)**

8          **MR. FLAUM:**  I think he points out -- I don't think

9     that he -- I'm trying to remember it -- says exactly that --

10    that's what that provision of 51 means but what he says is that

11    the Direction Order makes no provision for oral depositions of

12    any point, witnesses, third parties or parties.  It doesn't

13    make any provision for it and therefore obviously 51 is not

14    talking about depositions because there's no provision, he

15    says, that allows for that.  Absolutely none.  And that if

16    51 --

17         **THE COURT:**  But couldn't --

18         **(Talkovers)**

19         **MR. FLAUM:**  -- meant deposition, it would say and it

20    would use the word "evidence".  And that's why I think it's

21    important to read 51 and 42 together because 42 says, "Any

22    factual evidence".  So the Court clearly understood that

23    there's a difference between documents -- which are obviously a

24    subset of evidence.  And it says, "All evidence has to be given

25    by an affidavit".  And the only way to test that evidence is to

1   -- is to provide for cross examination at trial.

2          I think it's very telling if you read paragraph 12 of

3   Judge Mangatal's affidavit, she says --

4          **THE COURT:**  Of the original or the supplemental?

5          **MR. FLAUM:**  The supplemental.

6          **THE COURT:**  All right.

7          **MR. FLAUM:**  The original I don't think really has any

8   relevance based on the -- there was not going to be a witness.

9   But if you read 12, what she says is:

10          "To examine what the Direction Order provides for and

11          allows.  And in order to view the issue

12          comprehensively and in proper context, it is

13          necessary to refer to paragraph 51."

14          Which I'd agree with.

15          She then goes on to say:

16          "The Direction Order provides a procedure for using

17   evidence," citing to 51, but the Direction Order does not

18   provide a provision for using evidence, except documents and

19   only documents.  Evidence --

20          **THE COURT:**  But can I just --

21      **(Talkovers)**

22          **MR. FLAUM:**  -- that (indisc.) in paragraph 42.

23          **THE COURT:**  Excuse --

24          **MR. FLAUM:**  And documents here, they're not the same

25   thing.

1           And what Judge Mangatal is trying to do and I think

2  what Your Honor is (indisc.) to say that when the Cayman court

3  used the word "document" in 51, it didn't understand that.  It

4  certainly knows what evidence is.  And it would have been very

5  easy to write in 51, "Each party will disclose promptly to

6  other parties any and all evidence received from third parties

7  in offering."  It didn't say that.  And the fact that it used

8  the specific word of "documents" is significant and meaningful.

9  And I think it's error to ignore what the Cayman court said,

10  especially when the Cayman court understood the difference

11  between those two and specifically said evidence can only be

12  presented by affidavit and must be tested only in a hearing.

13  And that's the way to reconcile these two things.  They're not

14  reconciled by saying, Well, we're just going to ignore that the

15  Cayman Judge used the word 'documents' -- a very specific term

16  -- and else we use evidence and say, Oh, they mean the same

17  thing.  They don't mean the same thing, respectfully.  And it's

18  error to make them mean the same thing.

19           And that's why I believe that the -- in a nutshell

20  and I can go through more and I had planned when I didn't know

21  you were going to -- to go through Judge Henderson's

22  declaration which I can do but I know Your Honor has read it

23  carefully.  But that, in a nutshell, is really the key issue

24  here.

25           It would be inconsistent to allow a deposition

1   because it's not provided for.  But it's more than just not --

2   it's not silent as Judge Mangatal wants to believe.  It is in

3   fact explicit what 1782s can provide and they can provide

4   documents.  And Your Honor has already ruled that they can get

5   documents and that's -- and we're not, you know, we're not

6   going to appeal you and that's -- you know, we accept that and

7   that's I think a fair reading.  But I think to suddenly to say

8   documents in 51 actually means evidence, when 42 deals with

9   evidence is not a correct reading of this.  And I think it is

10  setting up a very -- something which is inconsistent with the

11  Cayman process that that judge has set up for this trial.

12          **THE COURT:**  But let me ask you this.

13          You know, again, if I were reading this sort of as

14  the statutory language, the plain language of the Direction's

15  Order, I think I would agree with you.  But let's say I do

16  agree with you and I leave aside what Judge Mangatal has said,

17  that is still, it seems to me, that still stops short of

18  showing that the Cayman court would affirmatively reject this

19  evidence because clearly through Lixor -- and I know there are

20  -- I don't remember which ones -- but some of the other cases I

21  read are from the Cayman Islands where depositions were

22  allowed.  So clearly -- and also I know there is also a

23  statement from Petitioners -- I think it's Mr. Kish or

24  someone -- that that language is in pretty much every

25  Direction's Order.  So clearly depositions have been allowed,

1  despite that language.  And to me that's because just because

2  the Direction's Order let's -- your best interpretation is that

3  it's pretty much silent concerning whether deposition testimony

4  will be accepted.  And I know you have Judge Henderson saying

5  it's "inconsistent with" but even he doesn't say flat out that

6  it would be rejected.  So the silence to me is not the same

7  thing as showing that it would not be, under some circumstances

8  at least, accepted by the Court.

9           So I think  your argument is a good one but I think

10 your standard that you have to meet is very tough and I just

11 don't see it having been met here.

12          **MR. FLAUM:**  To address that I also -- Judge Henderson

13 at paragraph 38 does address the fact that 51 talks only about

14 documents.

15          **THE COURT:**  Well, no, it says "chiefly".  It says --

16          **MR. FLAUM:**  I just wanted to point out that -- it

17 says it chiefly addresses treatment of documents obtained under

18 38 but I think there is, you know ...

19          **THE COURT:**  Couldn't also -- couldn't a document be a

20 deposition transcript?  I mean, you know, look.  I'm just it's

21 not -- it's not crystal clear but given that standard that you

22 have to show authoritative proof that it would be rejected --

23 and this is what Judge Snyder said -- how does that

24 interpretation -- which I think is eminently reasonable and I

25 might even agree with -- but how does it meet that standard?

1          **MR. FLAUM:**  Your Honor, I'm saying like it is

2    authoritative in the sense of if Your Honor reads it, the issue

3    isn't whether or not depositions could never ever be used in a

4    Cayman proceeding.  They obviously can be.

5          And Lixor -- and I don't need to go through, I think

6    Your Honor is familiar with it -- it said given the unique

7    circumstances of that case where somebody changed their

8    position and new evidence, the Court allowed them and so it can

9    happen.  But here, I think (indisc.) is when you look at the

10   clear language of that, that it uses the word "documents" --

11   and that's what 1782s are allowed.

12          In paragraph 42, you know, it is unequivocal that

13   evidence can -- can only be done by cross examination live at

14   trial.  I don't think the Court could have been any clearer.

15          **THE COURT:**  But even your expert is not -- that's how

16   I would interpret it, as I say, if I were reading the plain

17   language but that's -- even your own expert does not say that

18   that is the case.

19          **MR. FLAUM:**  I think what my own -- what my expert

20   says is the directors at paragraph 26:

21              "The Direction's Order has created a meaningful and

22              specific opportunity for dissenters and the grand

23              court itself to question Houlihan Lokey's witness on

24              all issues relevant to the appraisal action."

25              "Any additional opportunity for dissenters to

```
 1              question Mr. O'Donnell (phonetic) would be wholly

 2              inconsistent with the specified means of examination

 3              set forth in the Direction's Order and would, in my

 4              opinion, be disfavored by the courts of the Cayman

 5              Island."

 6         THE COURT:  If he had said "rejected" --

 7     (Voices overlap)

 8         MR. FLAUM:  -- very clear statement that --

 9         THE COURT:  Well --

10         MR. FLAUM:  -- is not permissible and a former judge

11  is saying -- I mean, that's the best I have.  I don't think

12  anyone can unequivocally read the mind of a judge and say 100

13  percent, I know how this judge would rule.  But --

14         THE COURT:  I think --

15         MR. FLAUM:  -- Judge Henderson says this -- given

16  this provision, this is totally inconsistent and this is not

17  allowed and would be absolutely disfavored.  I think it's --

18  you know, sort of an English gentlemanly -- for lack of using a

19  sexist term and I apologize for that -- term it, you know, what

20  he's saying there is this is not something the Cayman court

21  would allow or believe that -- he does not believe it's

22  appropriate or would be something that the Cayman court would

23  want.  And I think that is the standard.

24         THE COURT:  But you know what undermines that

25  argument is that Judge Henderson did come right out and flatly
```

1    say that any testimony going to the credibility of the witness

2    would absolutely be rejected and would be disallowed.  This

3    does not say "disallowed" or "rejected".  It says "disfavored".

4    And to me that is not the same thing.  And so I appreciate that

5    your argument that maybe he's just being polite but he clearly

6    knew how to say that something would not be allowed because he

7    did so with the parts of any deposition that would go to

8    credibility.

9            **MR. FLAUM:**  I think it's clear that the -- you know,

10   the appellate courts of the Cayman have spoken on that issue

11   and there's a clear statute that doesn't allow that in the

12   Cayman and so that's something you -- this is, you know, this

13   is I think slightly different.  What he's saying is, given this

14   Direction Order, given the way it's structured, this is not

15   something that a Cayman court would allow or would favor.  And

16   I think, you know, it is different than you can't point to a

17   statute that says you can never ever do this.  What he's saying

18   is, when you look at paragraph 51 and look at it with 42, this

19   is absolutely inconsistent with the specified terms of 42 and

20   is something that would be disfavored in the Cayman court.  And

21   that, in my mind, meets the standard that this is not something

22   you should exercise your discretion to grant.  What he's saying

23   very clear is this is not something, given the structure this

24   judge has set up, that should be -- that should happen and I

25   believe you should exercise your discretion in accord with

1    that, respectfully, Your Honor.

2         **THE COURT:**  All right.  I appreciate that.  As I say,

3    I really don't think that's a bad argument but I -- especially

4    given Judge Mangatal's contrary declaration and that tough

5    standard, I'm not sure I agree that it's ultimately correct,

6    even though I am sympathetic to some of these arguments.

7         But did you have anything you wanted to say as to any

8    of the other factors?

9         **MR. FLAUM:**  No, Your Honor.  I think obviously I

10   could make arguments about I think Factor One clearly in my

11   view is in our favor but I think it's also meaningful to look

12   again at Judge Henderson's declaration because what he says is,

13   you know, to the extent there's ever an allowance for like a

14   deposition or interrogatories in the Caymans for a witness,

15   it's to fill in holes.  Well here, there's no holes to be

16   filled in since the declaration hasn't -- the affidavit hasn't

17   even been filed yet.  And so I think the fact that they brought

18   this action, you know, before the witness statement is put in

19   doesn't I think make us not a participant.  I have represented

20   under oath to Your Honor that that's what's happening and I

21   would hope that's enough and so I think we're clearly a

22   participant.  And so I think that question, you know, One and

23   Three very much argue against allowing this deposition here and

24   I think on the other factors, I have nothing I want to add

25   beyond what we put in our papers.

1      **THE COURT:**  All right.  I appreciate it.

2          Mr. Loft, did you have anything to say?

3      **MR. LOFT:**  I didn't have anything to add, Your Honor,

4   unless you'd like me to address any of the specific points

5   raised by Mr. Flaum.

6      **THE COURT:**  No.  And Mr. Nelson, did you have

7   anything to say?

8      **MR. NELSON:**  Your Honor, as we noted in our

9   Intervention Application, we're neutral on the issue, in

10  principle, as to whether a deposition should occur but we do

11  have -- and especially in light of some of Your Honor's

12  observations just then -- some concerns and observations and

13  submissions we'd like to make about the timing of the

14  deposition, should it go forward, and I can lay those out now

15  if it pleases the Court.

16     **THE COURT:**  All right.  Sure, I'll hear that.

17     **MR. NELSON:**  Thank you, Your Honor.

18         The proposed order, as originally filed when the

19  application was made, contemplates document production by

20  Houlihan within a certain time of the subpoena being issued and

21  then a deposition -- and this is quoting from Docket 1/4:

22          Deposition, (quote), "at a mutually agreeable date

23          within a reasonable time after completion of

24          production by Houlihan."

25         So I'll just assume for the present purposes, Your

1   Honor, that say this month would be given over to document

2   production by Houlihan.

3          Turning next to the Direction's Order with which Your

4   Honor is very familiar already, as Your Honor has noted, at

5   page 52 of the Direction's Order it is stated that, "58.Com's

6   witness evidence in this matter must be (glitch in audio) by

7   April the 7th."  And Your Honor has already spent some time

8   reading paragraph 42 of the Direction's Order which makes clear

9   that when Houlihan's statement and whether other statements go

10  in, that's our evidence.  That's, in American terms, that's our

11  direct testimony -- and this is also addressed in

12  Mr. Henderson's Expert Report at paragraph 22.

13         There is then Witness Testimony and Reply comes in

14  later in April from the dissenters.  I believe that's April the

15  22nd and then we have an opportunity to reply in May.  That's

16  it.  That's -- after that point, the direct testimony from all

17  parties is in after May the 12th.

18         So our concern, frankly, is to ensure that if there

19  is to be -- and I think Your Honor has indicated Your Honor's

20  position -- if there is to be a deposition of Mr. O'Donnell

21  and/or Houlihan, our concern is to make sure that that happens

22  by late February -- and I'll explain exactly why we believe

23  that's not just appropriate but it would be disruptive to the

24  scheme in the Direction's Order if it happens any later.

25         First, Your Honor, this testimony coming in from

1   Mr. O'Donnell in his witness statement will stand as his direct

2   testimony, even though the trial will occur at a later date and

3   cross examination will occur at a later date.  And the order

4   also gives a guarantee that the dissenters will be able to

5   cross examine him on the matters in his witness statement, his

6   direct testimony.

7         If we look at American procedure, the Federal Rules

8   procedure, it's unheard of for a deposition to occur after

9   direct testimony is in.  I know that there's differences

10  between the two systems but I want to stress that first.

11        Second, the Direction's Order doesn't just provide

12  deadlines for witness statements, there's a scheme of things

13  that has to happen afterwards because pretty soon after the

14  direct testimony is closed, pretty soon after May of this year,

15  there's a process by which the experts in the Cayman

16  proceedings (glitch in audio) their work and they will need a

17  stable testimonial platform to do that, to work off.  And

18  whether you call a deposition testimony or whether you, as Your

19  Honor eluded to, refer to the end product as a transcript if

20  it's treated as a document, it -- the deposition will alter the

21  testimony or mix in this case.  And so the laboring occurs, the

22  less stable the platform for everyone in the Cayman Islands to

23  be able to understand what the testimony in the case is and for

24  the experts to be able to do their job.

25        It's also, as a practical matter, very disruptive for

1    my client, 58.Com, to finalize its factual evidence pursuant to

2    paragraph 42 of the Direction's Order if there's floating over

3    everyone the prospect that the factual evidence will shift in

4    the form of a subsequent deposition.  It's much easier if the

5    deposition if it's over and done with well in advance of April

6    discovery.

7            Additionally, Your Honor has, I think, if I heard

8    spent a lot of time studying the Lixor case which is a cryptic

9    case in some respects but one thing it makes clear is that a

10   deposition transcript doesn't just -- if it arises under

11   section 1782, it isn't just in.  There is a process by which

12   the courts decide whether it's -- it becomes part of the

13   evidentiary record.  Once again, the earlier you have a

14   deposition transcript to debate and to consider, the better for

15   everyone in the Cayman Islands.  And we would suggest that if

16   it's done by the end of February and questions about its

17   admissibility, if at all, could be at least addressed if not

18   resolved during March, again, we'd have a stable basis to

19   proceed in April with our witness statement.

20           And finally, as Your Honor has just noted, once

21   Mr. O'Donnell and Houlihan submit a witness statement pursuant

22   to paragraph 42 of the Direction's Order, as Your Honor has

23   just noted, once that happens that sort of cross this threshold

24   and become subject to Cayman procedures.  And so the rationale,

25   the 1782 discovery is diminished after that point so in a sense

1    consistent with what Your Honor has already said.  The logic of

2    the Applicants' case, the Petitioners' case, would dictate if

3    the deposition occur as soon as reasonably practical after the

4    documentary discovery process has occurred.

5         So those are my -- that's my position on the timing

6    if the deposition is to occur.

7         **THE COURT:**  All right.  Well that all seems eminently

8    reasonable to me.

9         So Mr. Loft, assuming that there are no problems with

10   the document production -- and I would think that there

11   wouldn't be because I know there have been representations from

12   Houlihan that they had already gathered much of this stuff and

13   given it to 58.Com to produce -- so assuming that the document

14   production does go forward and is essentially complete in

15   January, is there any reason why you couldn't conduct this

16   deposition by the end of February?

17        **MR. LOFT:**  No reason sitting here today.  I think

18   that should be fine.

19        **THE COURT:**  All right.  And as I say, I do think that

20   Mr. Nelson makes a number of good points but I certainly

21   understand that if there is a problem with the document

22   production, that could change things so you could always come

23   back.  Give Ms. Martinez a call and we'll try to get on the

24   video or the phone and resolve any issues.

25        But for now, I will say that the document production

1 should be done by a month from now, 30 days.  And the

2 depo -- which I think Houlihan has quite reasonably and clearly

3 stated is that the deponent -- I'm sorry.

4     Petitioner is seeking a Rule 30(b)(6) deposition and

5 Houlihan has represented that the affidavit is going to be in

6 that guise as well.  So that is a rule 30(b)(6) deposition will

7 take place by no later than February 28th.  And again, if

8 there's a reason why that can't happen, Mr. Loft you can always

9 seek relief in some form.

10     So I had previously ordered that the parties were to

11 meet and confer based on the guidance that I gave last time

12 concerning which deposition -- I'm sorry -- which document

13 productions I was going to allow and not, and to submit a

14 revised subpoena on that basis and they have done so.  It is

15 narrower; and particularly as to the time period, it's much

16 narrower so I'm assuming that there are -- and I had instructed

17 the parties that if there were still portions of the document

18 subpoenas to which they disagree, that you should make that

19 known and there was nothing known in what was submitted so I'm

20 going to accept that as the document subpoena.

21     As to the deposition subpoena, it is -- I know

22 Respondents asked that if I do order the deposition -- I am

23 going to order it -- again, the three mandatory factors are

24 satisfied.  And the discretionary ones I think -- I certainly

25 appreciate Mr. Flaum's arguments and I think they are good and

1  I might even agree with some of them but it's just that the

2  standard that he has to meet is very difficult and I don't

3  think that he has met that standard here.  And I think that

4  even if I were to say that the first factor was in Houlihan's

5  favor -- which I think that's really sort of neutral because

6  there are arguments both ways -- but even if I were to say that

7  it favors Houlihan, I think that the three other factors do

8  weigh for Petitioner so I am going to order the deposition.

9        So then that takes us to the subject matters, the

10  topics that the deposition is to cover.  And I did go back and

11  reread the arguments that Respondent had made originally to the

12  deposition.

13        I'm not convinced at this point by any of them in

14  light of the fact that the time frame has been limited

15  significantly.  You know, this would only be for the months of

16  April through September -- was it 2019?  Whatever that year is.

17  I think it's 2019.  So in light of that time limit, which is,

18  you know, less than a third of what Petitioners were originally

19  asking for, the topics seem to me -- which I'm trying now to

20  find the topics -- hold on one second.

21        **MR. FLAUM:**  On page 21 through 22 of our original

22  brief, Your Honor.

23        **THE COURT:**  Oh, no, I know where -- those are your

24  objections but I'm --

25        **MR. FLAUM:**  Oh, I'm sorry.

1          **THE COURT:**  -- trying to -- yeah, where are the --

2          **MR. LOFT:**  It's document 53-1, page ID 2022.

3          **THE COURT:**  All right.  I think --

4          **MR. LOFT:**  This is the revised subpoena has

5   Schedule B Deposition Topics at page 9.

6          **THE COURT:**  All right.  I think I alerted you folks

7   last time that I'm old and I read things in paper so I have to

8   just look.  I think I'll have it in a second.

9          **(Pause)**

10          I believe that Respondents had objected to 1, 5 and 6

11   but I don't -- in light of the shortened time, to me, 1 seems

12   to be a pretty standard question.  To the extent that

13   Mr. O'Donnell -- I think is his name -- would not be prepared

14   to answer it, seems like you could devote an hour of the seven

15   hours to somebody else who did actually collect the stuff who

16   maybe could speak to that.  And 5 and 6, you know, I know that

17   Respondent's position as to some of this is that, "We just used

18   what 58.Com gave us and we didn't do our own independent

19   analysis" or collection or anything like that but then that's

20   what you would answer when they ask you the question.  So I

21   don't -- the topics seem to me to be appropriate.  The fact

22   that you may have little to say concerning them is a different

23   point.  And I don't know whether that's true or not but if

24   that's true then you just say, "We just used what 58.Com gave

25   us" or "We didn't do independent analysis" or whatever.  So I

1   would tend to allow these deposition topics as written but I

2   certainly will hear from you, Mr. Flaum.

3       **(No audible response)**

4          Mr. Flaum, can you hear me?

5          **MR. FLAUM:**  I can, Your Honor.

6          **THE COURT:**  Oh.  I stunned you into silence; I'm

7   sorry.

8          **MR. FLAUM:**  That's true as well.  If I could just

9   raise one.  I understand Your Honor's ruling and it's fine.

10         Just one.

11         We've been meeting and conferring on sort of the

12  scope of additional documents and that we have to search for

13  and produce.  And I just want to -- you know, I want to preface

14  by saying about a couple hours ago they had sent us a list of

15  search terms that they were recommending.  We had significant

16  problems with the breadth of it.  We told them that and they

17  sent something back which I haven't even looked at because I

18  was busy preparing for today.  But I just want to hopefully

19  have Your Honor that just to advise both the parties, including

20  us, that to continue to act well and to try and get --

21  especially given the time frame -- not to have -- you know, the

22  search terms that were originally sent weren't even in any way

23  -- they were things like "any -- you know, for a six-month

24  period for all these people, any email that had the word

25  'capital' in it."  I mean that would -- not tied to this

1  transaction or this work.  And just to caution everybody to you

2  know to limit it to you know everything should be limited to

3  this work and obviously people who work on more than just the

4  58.Com matter and obviously lots of things are going to talk

5  about 'capital' or 'profit' and that we all come up with search

6  terms that are limited and really directed to try and get this

7  done quickly and efficiently.

8          **THE COURT:**  Well I will say that one of my least

9  favorite things is when parties force me to get involved in

10  Nit-picking search terms and et cetera, et cetera, and I'm not

11  a happy camper when that happens.  And you can ask my husband,

12  you don't want to see that so please work together in good

13  faith and be reasonable.  You know, your example about capital,

14  it does seem to me as overinclusive and so I do expect the

15  parties to meet and confer in good faith, that you all seem

16  reasonable and to get this done.  If you absolutely cannot

17  agree on something, you know, you can call Ms. Martinez and

18  I'll try to make myself available but I'd strongly prefer that

19  you not ask for my sort of immediate assistance unless it's a

20  very narrow discreet issue that I can wrap my head around

21  without having to read a bunch of stuff and not have any

22  factual disputes or whatever.  So that's just some guidance

23  there.

24          So how about the deposition topics, Mr. Flaum.  Did

25  you want to be heard about that?

1      **MR. FLAUM:**  No, Your Honor, I don't have anything to

2  add beyond what I (indisc.).  I do think limiting the time

3  frame, certainly on 5 and 6, goes a long way.

4          And my concern, if anything, is to the extent -- and

5  I think Your Honor really addressed this, to the extent they

6  want to ask about the company' projections and that we -- what

7  I don't want to have is a deposition where I think you could

8  read these things to say they would then take us through every

9  -- (indisc.) if we say we relied on them and that's what we did

10  that then go through and say, "Well what do you think about,

11  you know, this projection for this business for," you know it

12  just -- I don't want to become -- because there is no discovery

13  like this in the Caymans -- to suddenly become, in essence, the

14  spokesperson and the deponent for the company on things we

15  didn't do.  And that's really -- that was really my concern

16  about the breadth of these.  If you read them very broadly that

17  it, you know, it does that.  As long as, you know, with Your

18  Honor's guidance I think that if we say, Look, we took them and

19  we accepted them, then that's the end of it and I don't have a

20  problem with Your Honor's ruling.

21          **THE COURT:**  All right.  Thank you.

22          And then the final thing I wanted to discuss is the

23  protective order.

24          So I honestly -- I gather it was Houlihan but I

25  honestly don't remember that someone or other had a concern

1   about confidentiality and that we would need to get a

2   protective order in place.  Obviously, I'm not in charge of

3   what gets admitted or how in the Cayman Islands and so nor can

4   I control the Cayman Islands, nor would I want to control the

5   Cayman Islands for it.  So I can only enter a protective order

6   that would govern the evidence gathering here.  And then any

7   sort of confidentiality concerns about what happens in the

8   Cayman Islands would have to be brought to that court's

9   attention.  But is there some kind of problem or will the

10   parties be able to submit a stipulated protective order here

11   soon to the extent they still think one is necessary?

12          MR. FLAUM:  Your Honor, I think -- again (indisc.).

13   I think we'll be able to resolve it.  We drafted one and sent

14   it over to dissent theirs.  We're waiting to get back their

15   comments but I'm highly confident that Mr. Loft and I, or more

16   particularly people that are working with us, are going to be

17   able to work out the text of an order that we should be able to

18   agree to.  And if there's not agreement, I think it'll be very

19   very limited and easy to put that -- you know, whatever minor

20   issue there is to Your Honor but I think we should be able to

21   work it out.

22          THE COURT:  All right.  Mr. Loft, did you have any

23   contrary notions or?

24          MR. LOFT:  I echo the comments from Mr. Flaum.  We

25   did just receive the draft late last week and we're obviously

```
1    conferring with our Cayman Islands counsel on how it will work.

2         As Your Honor highlighted, protective orders and

3    these 1782s are somewhat tricky because you have to balance the

4    confidentiality issues between the U.S. proceedings and

5    whatever foreign proceedings are ongoing, and we're seeing

6    issues of that arise to some extent, some complications arise

7    to some extent in the draft protective order that we received.

8    We're trying to work through those.  I agree with Mr. Flaum, we

9    should be able to work through those.

10        There's also an NDA in the Cayman Islands proceeding

11   itself that governs confidentiality.  That may be a way we kind

12   of resolve some of these issues but this hasn't been conferred

13   upon and is not really ready for Your Honor's consideration but

14   we appreciate that the Court is available to us if we need you.

15        THE COURT:  All right.  Well just bear in mind, I'm

16   not going to set a deadline for the protective order to be

17   submitted but just bear in mind that I do have a deadline of

18   30 days from today for the document production and then

19   February 28th for the deposition.  So you're going to have to

20   get the protective order -- and I need obviously some time to

21   read it over, et cetera, so just bear that in mind.

22        MR. NELSON:  If I may?

23        THE COURT:  Sure.

24        MR. NELSON:  As the Intervening Party, we take it

25   somewhat personally since it's company data that is in place.
```

1   We have I think our side (indisc.) the greatest stake in the

2   protective order.  I'm optimistic that it can be achieved and

3   we've certainly seen one draft.

4        But one point I think to the point Your Honor just

5   made is our chief concern in protecting company data is to make

6   sure there's -- whatever is gotten in this proceeding under

7   Section 1782, yes, it goes to the Cayman Islands -- and as my

8   colleague from the dissenters can just indicated there is --

9   there are protective orders there but we want to make sure

10  there's no slippage.  So if it's here it's protected, if it

11  goes to the Cayman Islands, it's protected, and those are the

12  only places that this data is going to go.

13       **THE COURT:**  All right.  Well I'm sure that either

14  directly or indirectly through Mr. Flaum, the Petitioner and

15  Respondent will involve you in this process and make sure that

16  the protective order is agreeable to everyone.

17       I did want to note that to the extent Respondents do

18  want to appeal me, our Local Rule 72-2.1 gives you 14 days to

19  do so, otherwise this will be the final order in this matter.

20       And finally, I just wanted to thank you folks because

21  I thought all together the briefing was really excellent and it

22  was thorough and it really hit everything and I just appreciate

23  it.  You folks -- I know you're from New York but you're

24  welcome back here anytime.

25       So all right.  Is there anything further?

1          **MR. FLAUM:**  Not from me, Your Honor, except to say

2   thank you.

3          **THE COURT:**  You're welcome.

4          **MR. LOFT:**  Nothing here.  Thank you, Your Honor.

5          **THE COURT:**  All right.  Thank you.  Bye-bye.

6      **(Proceeding adjourned at 11:08 a.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    January 10, 2022

          Signed                                                      Dated

*TONI HUDSON, TRANSCRIBER*